ROBERT E. GRAM vs. LIBERTY MUTUAL INSURANCE
COMPANY & others.[1]

Middlesex.  May 5, 1981. — December 9, 1981.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, NOLAN, & LYNCH, JJ.

*Contract*, Employment.  *Damages*, Breach of employment contract.

In an action by an employee against his immediate superiors for tortious
interference with the employee's rights under his employment contract
the evidence did not warrant a verdict against the defendants, there
being no showing that the defendants acted with malice in bringing
about the employee's discharge.  [663-665]

Evidence that there was no good cause for the discharge of an employee
of an insurance company, that there had been no inquiry into whether
his discharge was justified, and that the company obtained a benefit in
the retention of the employee's renewal commissions was insufficient
to establish that the company acted in bad faith in discharging the
employee.  [669-670]

An employee at will discharged without cause by an employer who had
no improper motive is not entitled to recover for breach of the contract
of employment.  [670-671]

An employee of an insurance company who was discharged without cause
was entitled to recover renewal commissions on insurance policies
based on his past services with a reduction to reflect the proportion of
his time that would have been devoted to the servicing of those
renewal policies.  [671-674] NOLAN, J., with whom LYNCH, J., joins,
dissenting.

CIVIL ACTION commenced in the Superior Court on
February 24, 1977.

The case was tried before *Clancy*, J., a District Court
judge sitting under statutory authority.

After review was sought in the Appeals Court, the Su-
preme Judicial Court ordered direct appellate review on its
own initiative.

[1] James C. Fisher and Richard G. Gosselin.

*Kalvin M. Grove (James D. Casey* with him) for the defendants.

*Joseph D. Regan* for the plaintiff.

WILKINS, J. We consider in a new context the rights of an employee at will whose employer discharged him without good cause. We conclude that, in the circumstances, the employee is not entitled to normal contract damages for the termination of his at-will employment. He is, however, entitled to recover identifiable, reasonably anticipated future compensation, based on his past services, that he lost because of his discharge without cause. We also consider whether the evidence warranted a verdict for the employee on his claim that his immediate superiors tortiously interfered with his rights under his employment contract. We conclude that there was no case for the jury on the employee's claim against his immediate superiors.

We summarize the evidence most favorable to the plaintiff (see *Boyle* v. *Wenk*, 378 Mass. 592, 593 [1979]), and resolve in his favor all reasonable inferences that could be drawn from that evidence (see *Alholm* v. *Wareham*, 371 Mass. 621, 627 [1976]). The plaintiff, Robert E. Gram, was an insurance sales representative for Liberty Mutual Insurance Company (Liberty) from 1970 until he was discharged on January 6, 1977. His compensation was determined by percentage commissions on new sales and by lower percentage commissions on the renewal of policies previously sold. In 1976, Gram's renewal commissions amounted to $9,850, or about 28% of his total earnings for that year. Gram's employment contract was partially oral and partially written. At the time he was hired Gram signed an agreement limiting his right to compete in soliciting insurance contracts in a limited geographical area for a period of eighteen months after termination of his employment for any reason. At the time of his discharge, Gram was assigned to Liberty's Chelmsford office. His immediate superior was the defendant Richard G. Gosselin, the district sales manager for Chelmsford and Andover. Gosselin's immediate superior was the defendant James C. Fisher, an assistant division

sales manager, who worked in an office in Lexington. Regular appraisals of Gram's work showed his work to be good, at least satisfactory, in all categories of performance and excellent in certain respects. Gram was a hard worker, the most productive salesman in policies and premiums of the nine sales representatives under Gosselin.

There were certain incidents during Gram's term of employment that presented administrative problems in the view of his superiors. In September, 1973, Gram altered a company mailing by having a headline printed in block letters — "10% AUTO DIVIDEND." He then changed by hand the printed percentage to 15%. Gosselin told him that no alterations were permitted in company mailings, and Gram did not thereafter alter any company mailings. At a sales managers' meeting held sometime between October, 1974, and July, 1976, Gosselin and Fisher said that they would like to have Gram out of the Chelmsford office. The witness who overheard these statements, attributed to Gosselin and Fisher, testified that he inferred from this that they did not like Gram. A former coworker testified that Gram was not disliked in the office. In June, 1976, Fisher summoned Gram to discuss Gram's use of a map Gram had prepared to show customers and prospective customers the location of the Chelmsford office. Fisher told Gram that the map was not authorized by Liberty and should not be used. Gram ceased using it. In September, 1976, Fisher and Gosselin challenged Gram's use of certain rubber stamps Gram had had made up, and they also discussed with Gram his obligations as a salesman.

The incident that led to Gram's discharge occurred in early January, 1977. Gram had typed a note on a personal memo pad to send to between thirty and fifty prospective customers whom he had already met and for whom he had made out applications for 1977 motor vehicle insurance. He xeroxed the typed note, a copy of which is set forth in the margin,[2] for each prospective customer and placed each

[2] "GOOD NEWS!
"EVERYONE IN MASSACHUSETTS WILL BE GIVEN AN ADDITIONAL 30 DAYS TO SHOP AROUND FOR AUTO INSURANCE!

note in an open, addressed envelope to be stamped and mailed in the regular course for Liberty's Chelmsford office. These envelopes and their contents came to Gosselin's attention, and he in turn brought them to Fisher's attention. They told their superior, one Edward Argent, thHt the notes were unauthorized mailings in violation of Liberty's policies and sought Argent's approval to discharge Gram. They did not first confront Gram with their conclusions. They made no statements favorable to Gram in their meeting with Argent. After checking with his superior, Argent authorized Fisher to fire Gram but only after they had given him a chance to explain his actions. Gram told Fisher and Gosselin that the notes were personal notes. Fisher disagreed and, on January 6, 1977, after consulting with Argent, he fired Gram.

The jury were warranted in finding that the mailing of xeroxed, personalized copies of a typewritten note to customers with whom Gram had already dealt did not violate any policy of the company. They were further warranted in concluding that Gram was discharged without good cause. As will be seen, the questions remain whether the jury were warranted in concluding that Gosselin and Fisher acted with malice and that Liberty dealt unfairly and in bad faith in discharging Gram so as to justify imposing liability on Liberty for breach of contract.

Gram brouvht this action promptly after his discharge, alleging against Liberty a bad faith breach of his oral contract of employment and alleging against Gosselin and Fisher intentional interference with his employment contract by tortiously procuring his discharge. The defendants

---

"YOU'LL BE ABLE TO CHANGE INSURANCE COMPANIES AT ANY TIME DURING THE MONTH OF *JANUARY* AT NO PENALTY!

"MAIL YOUR APPLICATION BACK TO ME; I'LL RETURN IT TO YOU WITH OUR 1977 AUTO RATES SO YOU CAN COMPARE THEM TO YOUR PRESENT COMPANY!

"ANY QUESTION, PLEASE CALL ME.

SINCERELY,
[signed]   Bob
BOB GRAM"

unsuccessfully moved for directed verdicts at the close of the plaintiff's case and at the close of all the evidence. See Mass. R. Civ. P. 50(a), 365 Mass. 814 (1974). The jury returned a verdict against Liberty in the amount of $100,000, against Fisher in the amount of $40,000, and against Gosselin in the amount of $30,000. The judge denied the defendants' motion for judgments notwithstanding the verdicts or for a new trial. See Mass. R. Civ. P. 50(b), 365 Mass. 814 (1974). We transferred the defendants' appeals here on our own motion.

We consider first the question whether the evidence warranted the verdicts against Gosselin and Fisher because, if, as we conclude, there was insufficient evidence to warrant a finding that they acted with malice toward Gram, that conclusion has a bearing on the question whether Liberty acted without good faith and fair dealing in discharging Gram.[3]

1. The evidence did not warrant a verdict against Gosselin or Fisher on Gram's claim that each intentionally interfered with his contractual rights with Liberty. Because Gosselin and Fisher were acting within the scope of their employment responsibilities, Gram acknowledges that each was privileged to act as he did unless he acted out of malevolence, that is, with "actual" malice. See *Steranko* v. *Inforex, Inc.*, 5 Mass. App. Ct. 253, 272-273 (1977), where the authorities are carefully collected. See also *Owen* v. *Williams*, 322 Mass. 356, 360-361 (1948) (jury warranted in finding no privilege existed); *Caverno* v. *Fellows*, 300 Mass. 331, 336-338 (1938) (evidence did not show that malevolence was the supervisor's sole or even dominant reason for making a report which led to the plaintiff's discharge). The rule assigning liability to corporate officials only when their actions are motivated by actual, and not merely implied, malice has particular force because "their freedom of action

---

[3] Liberty could not be liable for tortious inference with its own contract with Gram (*Vigoda* v. *Barton*, 338 Mass. 302, 304 [1959]), but, if Gosselin and Fisher, acting within the scope of their employment, engaged in bad faith and unfair conduct, their actions might properly be charged to Liberty.

directed toward corporate purposes should not be curtailed by fear of personal liability." *Steranko* v. *Inforex, Inc., supra* at 273. See Avins, Liability for Inducing a Corporation to Breach its Contract, 43 Cornell L.Q. 55, 59 (1957).

Malice may be shown by the proof of facts from which a reasonable inference of malice may be drawn. The line between a proper inference and unwarranted conjecture is not easily drawn. The answer depends on the evidence in each case and on what the trier of fact may reasonably infer from that evidence. The fact that there is no direct evidence that Gosselin and Fisher acted with malice to obtain Gram's discharge is not dispositive. There might be sufficient proof that spite or ill will was the controlling factor in urging Gram's discharge, derived from a "rational inference of probabilities from established facts." *Bigwood* v. *Boston & N. St. Ry.*, 209 Mass. 345, 348 (1911). See *Zezuski* v. *Jenny Mfg. Co.*, 363 Mass. 324, 329 (1973). Any reasonable inference of malice must, however, be "based on probabilities rather than possibilities." *Alholm* v. *Wareham*, 371 Mass. 621, 627 (1976). See *Poirier* v. *Plymouth*, 374 Mass. 206, 212 (1978).[4]

Gram relies on evidence that Fisher and Gosselin, some months before Gram's discharge, expressed a desire that Gram not be in Liberty's Chelmsford office. This was not, of course, evidence of a wish that Gram be fired. The witness who overheard the conversation inferred that neither man liked Gram. We think the inference, assuming it to be reasonable, that Gosselin and Fisher did not like Gram would not alone reasonably warrant a further inference that it was probable that Gosselin or Fisher acted with ill will to obtain Gram's discharge. Such an inference on an infer-

---

[4] The distinction between possibilities and probabilities is shown in *Commonwealth* v. *Ellis*, 356 Mass. 574, 578-579 (1970). The court concluded that the trier of fact could reasonably infer (beyond a reasonable doubt because the case was a criminal one) that the defendant intended to sell heroin in his possession because of the volume of heroin he had. From its reasonable inference concerning the heroin, however, the trier of fact could not reasonably infer a probability of an intent to sell morphine of which the defendant had a small quantity.

ence is particularly unwarranted where, despite years of close association with Gosselin and Fisher, Gram did not testify to, or otherwise present evidence of, a single, direct manifestation of ill will toward him by Gosselin or Fisher.

We must, of course, consider the evidence collectively in deciding whether an inference of malice was warranted. Gram argues that it is incredible that Gosselin and Fisher really believed that he had violated a company rule. He says the level of stupidity required to hold that belief was so low that they could not really have believed their stated reason for discharging Gram. Gram argues that, because their stated reason was incredible, the jury could reasonably draw the inference that the individual defendants acted maliciously. We note, however, that their stated reason was not devised after the discharge as a justification. They did not act on their own because they subjected their conclusion for consideration by their superiors.

Even if we assume, as seems reasonably warranted, that Gosselin and Fisher wished Gram did not work under them, that they did not conduct an adequate investigation of the alleged rule violation and that, in fact, there was no new or good reason to justify Gram's discharge, an inference of an intent to obtain Gram's discharge out of ill will toward him is no more probable than is the inference that Gosselin and Fisher acted in response to a sincerely held but erroneous view that the mailing of more than thirty substantially identical memoranda was contrary to company policy. An inference of the probability of malice, action motivated by spite, does not reasonably follow from a showing, in these circumstances, only of negligence or of sloppy and unfair business practices.

2. We come then to the question whether the judge should have granted Liberty's motion for a directed verdict in its favor or Liberty's motion for judgment notwithstanding the verdict, each of which presents the same issue. *D'Annolfo* v. *Stoneham Hous. Auth.*, 375 Mass. 650, 657 (1978). We have recognized a right of recovery for the bad faith termination of a business relationship which involved

overreaching by one party seeking to deny the reasonable expectations of the other party to a financial benefit of that relationship. Thus, in *RLM Assocs. v. Carter Mfg. Corp.*, 356 Mass. 718 (1969), we upheld the plaintiff's right to recover a lost commission where the evidence permitted the conclusion that the defendant's termination of its employment arrangement with the plaintiff was based in part on a desire to avoid paying the commission. That motive in turn warranted the inference that the termination was in bad faith. See *Malloy v. Coldwater Seafood Corp.*, 338 Mass. 554, 562-563 (1959). A somewhat similar situation existed in *Fortune v. National Cash Register Co.*, 373 Mass. 96 (1977), where we imposed an obligation of good faith and fair dealing in the termination of the employment of a salesman in spite of the fact that the terms of his employment permitted his discharge without cause and without any express obligation on the employer to pay the commission. *Id.* at 104-105. We said that "[w]e think that the evidence and the reasonable inferences to be drawn therefrom support a jury verdict that the termination of Fortune's twenty-five years of employment as a salesman with NCR the next business day after NCR obtained a $5,000,000 order from First National was motivated by a desire to pay Fortune as little of the bonus credit as it could." *Id.* at 105. These cases involved an intent of the defendants to benefit financially at the plaintiffs' expense.

We have not decided, however, to impose liability on an employer for breach of a condition of good faith and fair dealing in the discharge of an employee simply because there was no good cause for the employee's discharge. In the *Fortune* case, we expressly left open the question whether we would adopt the rule announced in *Monge v. Beebe Rubber Co.*, 114 N.H. 130 (1974), that there was an obligation to act in good faith implicit in every contract for employment at will. See *Fortune v. National Cash Register Co., supra* at 104. Nor have we equated the absence of good cause for the discharge of an employee with the absence of good faith. *Id.* Thus, in *Richey v. American Auto.*

*Ass'n*, 380 Mass. 835, 839 (1980),where we assumed that the decision to discharge an employee was "bad, unjust, and unkind" (thus without good cause) and contrary to the employee's expectations, we said "if the present facts should be held to qualify a discharged employee for relief, then a new practical definition might have to be given to employments theoretically terminable at will."[5] We have, however, recognized that good faith in the termination of a contractual relationship may require more than simply adhering to the requirement of good faith as defined in the Uniform Commercial Code. *Zapatha* v. *Dairy Mart, Inc.* 381 Mass. 284, 297 n.17, 299-300 (1980). See, e.g., G. L. c. 106, § 1-201 (19) ("honesty in fact in the conduct or transaction concerned"); G. L. c. 106, § 2-103 (1) (b) (as to a merchant, under the sales article, "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade"). In the *Zapatha* case, which involved termination of a franchise agreement without good cause, we looked at the consequences of the termination and concluded that the franchisees were not deprived of any earnings, loss of good will, or loss of investment and were not subjected to any unfair dealing. Concluding that the franchise was properly terminated, we said the result was appropriate "[u]nless we were to take the position that termination without cause of a franchise agreement of the character involved here is prohibited invariably by the law of the Commonwealth, a position we decline to adopt (cf. *Richey* v. *American Auto. Ass'n*, 380 Mass. 835 [1980])." *Zapatha, supra* at 300.

Gram does not argue that he is entitled to recover damages for breach of contract simply because he was dis-

---

[5] The *Richey* case was based on tort principles, involving a claim that the plaintiff sustained severe emotional distress as a result of the employer's outrageous conduct in discharging him. See *Agis* v. *Howard Johnson Co.*, 371 Mass. 140 (1976). We noted that no claim was based on the principles of the *Fortune* case, and said that the considerations which led to the result in the *Fortune* case would not "be remotely applicable in the circumstances of the discharge of this probationary employee." *Richey* v. *American Auto. Ass'n*, 380 Mass. 835, 839 (1980).

charged without good cause. Appropriately, he does not equate the employer's obligation of good faith and fair dealing (see *Fortune, supra* at 104) with good cause. Certainly good cause to discharge an employee would tend to negate the existence of bad faith in the decision to discharge an employee. But termination in the absence of good cause does not establish bad faith, and it is only a factor in determining whether there was fair dealing. Nor does Gram rely on some specific public policy against upholding his discharge, such as appears in cases in which an employer's retaliatory discharge was its reaction to appropriate, socially desirable conduct of the employee.[6] He does point, how-

---

[6] The general rule that an employment-at-will contract could be terminated at any time for any reason or for no reason at all was regarded as well established until recently. See Annot., Employee's Arbitrary Dismissal as Breach of Employment Contract Terminable at Will, 62 A.L.R.3d 271 (1975). There has been some recent movement away from such a firm rule. See, e.g., *Fortune* v. *National Cash Register Co.*, 373 Mass. 96, 102 (1977); *Monge* v. *Beebe Rubber Co.*, 114 N.H. 130, 133 (1974).

Most of the cases presenting an exception to the general rule have relied on public policy considerations in declining to give effect to the employer's reason for the termination. See *Pierce* v. *Ortho Pharmaceutical Corp.*, 84 N.J. 58, 67-70 (1980), where cases are collected and analyzed. Thus, in *McKinney* v. *National Dairy Council*, 491 F. Supp. 1108 (D. Mass. 1980), the judge concluded that the termination of an at-will employee on the basis of age violated the employer's implied obligation of good faith and fair dealing expressed in the *Fortune* case. *Id.* at 1122. The judge recognized the clearly established public policy, expressed by statute, against discharge due to age of an employee between the ages of forty-five and sixty-five. *Id.* at 1121. See G. L. c. 149, § 24A; G. L. c. 151B, § 4. The opinion collects various cases concerned with public policy violations in the termination of at-will employment. *Id.* The unacceptable grounds for termination of at-will employment presented in those cases include termination for refusal to commit perjury, for filing a workmen's compensation claim, for serving on a jury, and for refusing to take a statutorily-barred polygraph test. To the cases cited in the *McKinney* opinion, we add the following cases: termination for filing a workmen's compensation claim (see *Kelsay* v. *Motorola, Inc.*, 74 Ill. 2d 172, 185 [1979]; *Brown* v. *Transcon Lines*, 284 Or. 597, 603-604 [1978]; *Shanholtz* v. *Monongahela Power Co.*,      W. Va.      ,      [1980][270 S.E.2d 178, 181 (W.Va. 1980)]), and termination for refusal to engage in illegal activity (see *Tameny* v. *Atlantic Richfield Co.*, 27 Cal. 3d 167, 172 [1980]; *Harless* v. *First Nat'l Bank*,      W. Va.      ,      [1978] [246 S.E.2d 270, 276 (W.Va. 1978)] [tort action]). Not all courts have recognized a "public policy exception." See *Pierce* v. *Ortho Pharmaceutical Corp.*,

ever, to the absence of any good cause for his discharge, to the absence of any bona fide inquiry into whether his discharge was justified, and to the benefit Liberty obtained in the retention of his renewal commissions as evidence of bad faith. Liberty makes no argument that it is isolated from liability because its higher executives who authorized the firing were immune from the allegedly improper motives that infected Gosselin and Fisher.[7]

We find no basis for a reasonable inference that Liberty was motivated to discharge Gram by a desire to obtain the

---

*supra* at 70; Note, Protecting At Will Employees against Wrongful Discharge: The Duty to Terminate Only in Good Faith, 93 Harv. L. Rev. 1816, 1823-1824 (1980).

The Supreme Court of New Hampshire has adopted a "narrow construction" of its opinion in *Monge* v. *Beebe Rubber Co.*, 114 N.H. 130 (1974), so that the New Hampshire rule now fits into the class of cases we discuss in this footnote. "We construe *Monge* to apply only to a situation where an employee is discharged because he performed an act that public policy would encourage, or refused to do that which public policy would condemn." *Howard* v. *Dorr Woolen Co.*, 120 N.H. 295, 297 (1980). The facts in the *Monge* case fit the "public policy exception" because the plaintiff, a married woman with three children, was discharged for refusing to "be nice" to her foreman. Indeed, the New Hampshire court declined in the *Howard* case to allow recovery for the discharge of an employee at will based on the employee's age, even though the discharge was in violation of a State statute against age discrimination.

[7] Liberty did not file a written motion for a directed verdict. It did not argue on its oral motion for a directed verdict, nor does it argue here, that the person who had the authority to discharge Gram, whoever that may have been, made that decision free from any improper motive and from any knowledge that Gosselin and Fisher acted with malice. This question was raised in *Pstragowski* v. *Metropolitan Life Ins. Co.*, 553 F.2d 1 (1st Cir. 1977), which concerned the discharge of an insurance company employee in New Hampshire. The court recognized as applicable the rule in *Monge* v. *Beebe Rubber Co.*, 114 N.H. 130 (1974), giving a contract claim to an employee at will discharged by reason of the bad faith, malice, or retaliatory motives of his employer. The First Circuit Court of Appeals characterized the question as "important and difficult." *Pstragowski* v. *Metropolitan Life Ins. Co.*, *supra* at 3. The court did not answer the question, however, because the former employer did not adequately preserve the question in presenting its motion for a directed verdict. *Id.* As to the attribution to decision makers of the motives of supervisors, see *Trustees of Forbes Library* v. *Labor Relations Comm'n*, *ante* 559, 569-570 (1981).

benefit of Gram's renewal commissions. There was no evidence that Liberty even considered the matter of renewal commissions. Gram was the most productive salesman in the office. If one assumes, as seems unavoidable, that Liberty regarded successful sales efforts to be to its economic benefit, the possibility of its acquisition of Gram's renewal commissions was a minor factor balanced against the potential of Gram's continued successful sales efforts. Thus, the evidence did not warrant a finding of overreaching of the character found in the *RLM Assocs.* and *Fortune* cases. Nor did the evidence warrant a finding that Gram's employment contract had an implied condition that he would not be discharged except when Liberty had a good faith belief that his firing was justified for business reasons. What we have is a case in which the jury were warranted in concluding that Gram's discharge was "bad, unjust, and unkind" (see *Richey* v. *American Auto. Ass'n, supra* at 839), contrary to Gram's reasonable expectations, and the product of inadequate investigation.

The question, then, is whether we should allow recovery for breach of a contract of employment at will where an employee is discharged without cause by an employer who had no improper motive for discharging the employee, unless one regards the absence of good cause itself or the mistaken belief that there is good cause as conclusively demonstrative of bad faith. A forceful argument can be made that job security should be assured by a common law rule protecting a person in Gram's position.[8] Collective

[8] Numerous commentators have advocated the recognition of an employee's right to retain employment absent "just cause" for termination. See, e.g., Glendon & Lev, Changes in the Bonding of the Employment Relationship: An Essay on the New Property, 20 B. C. L. Rev. 457, 473-474 (1979); Blades, Employment at Will vs. Individual Freedom: On Limiting the Abusive Exercise of Employer Power, 67 Colum. L. Rev. 1404, 1413-1414 (1967); Blumrosen, Settlement of Disputes Concerning the Exercise of Employer Disciplinary Power: United States Report, 18 Rutgers L. Rev. 428 (1964); Note, Protecting At Will Employees against Wrongful Discharge: The Duty to Terminate Only in Good Faith, 93 Harv. L. Rev. 1816, 1840 (1980); Note, Implied Contract Rights to Job Security, 26 Stan. L. Rev. 335, 368 (1974); Comment,

bargaining agreements and public employment statutes generally permit discharge only for good cause. But other employment relationships, unless the employee is dealing knowledgeably from strength, generally do not provide that measure of job security. We could, of course, adopt a rule extending a common law right to an at-will employee to recover damages for breach of an imposed condition of his or her employment contract that he or she not be discharged except for good cause. It is also within the authority of the Legislature to enact such a rule. The Employment Security Law of the Commonwealth recognizes the right of a wrongfully discharged employee to receive limited payments for a period of time. G. L. c. 151A, §§ 22-37. Our adoption of a common law right of recovery for discharge without cause would tend to duplicate (or perhaps supersede or supplement) certain benefits available under the Employment Security Law. We decline at this time to adopt a general rule that the discharge of an at-will employee without cause is alone a violation of an employer's obligation of good faith and fair dealing. We are aware of no case that has gone this far.[9]

There is in this case, however, an element of Gram's compensation that requires special consideration. Although there is no evidence warranting an inference that Liberty discharged Gram for the purpose of appropriating his renewal commissions, the fact remains that Gram lost reasonably ascertainable future compensation based on his past services. Gram had a reasonable expectancy of some re-

---

Towards a Property Right in Employment, 22 Buffalo L. Rev. 1081, 1108-1109 (1973).

[9] We attribute no particular significance to the absence of internal administrative procedures for determining the propriety of Gram's discharge. If there had been such procedures, including a fair opportunity for Gram to state his position before an impartial superior, and Gram had nevertheless been discharged, the fact would remain that Gram was discharged without good cause. It is difficult to determine whether it is worse to discharge an employee without good cause where no adequate investigation was conducted or to do so after a full hearing that resulted in an improper decision that there was good cause.

newal commissions, although, to be sure, each renewal commission depended on the policyholder deciding to continue his coverage with Liberty. Gram would not apparently have been entitled to renewal commissions after his retirement. His right to renewal commissions was in no sense guaranteed. Moreover, a certain amount of "servicing" of these policyholders would be required from time to time, work that some other Liberty employee, in Gram's stead, would have to perform.

We think that the obligation of good faith and fair dealing imposed on an employer requires that the employer be liable for the loss of compensation that is so clearly related to an employee's past service, when the employee is discharged without good cause. See *Druker* v. *Roland Wm. Jutras Assocs.*, 370 Mass. 383, 385 (1976); Restatement (Second) of Contracts, § 205 (1981). Our decisions have recognized a distinction between the loss of future wages for past service (see *Fortune* v. *National Cash Register Co.*, 373 Mass. 96, 105-106 [1977]); *RLM Assocs.* v. *Carter Mfg. Corp.*, 356 Mass. 718 [1969]), and the loss of future income for future services (see *Zapatha* v. *Dairy Mart, Inc.* 381 Mass. 284, 299-300 [1980]; *Richey* v. *American Auto. Ass'n*, 380 Mass. 835, 839 [1980]). Gram's contribution to Liberty's future income was not tenuous. Liberty benefited from its discharge of Gram without cause, assuming that the normal course of the servicing of renewal business would cost less than the "forfeited" renewal commissions. In such a case, Liberty's absence of good faith need not be proved to the extent that there must be a showing of an improper motive for the discharge. Fair dealing, the other aspect of the obligation imposed on an employer, requires recognition of the agreed worth of such an employee's past service.[10]

---

[10] Indeed, inconsistency with the "justified expectations of the other party" and the violation of "community standards of decency, fairness or reasonableness" (Restatement [Second] of Contracts § 205, Comment a) may demonstrate the absence of "good faith." Such an objective test of "good faith" is not significantly different from the test of "fair dealing." See Burton, Breach of Contract and the Common Law Duty to Perform

We remand the case for a determination of damages, measured by the amount of renewal commissions Gram reasonably could have expected to receive, reduced to reflect the proportion of his time that would reasonably have been expected to have been devoted to the servicing of those renewal policies. Gram has made no specific showing of his loss of any other identifiable, future benefit, such as pension rights, reflective of past services to Liberty. Cf. *Moore* v. *Home Ins. Co.*, 601 F.2d 1072, 1074-1075 (9th Cir. 1979).

A retrial of only the question of damages is necessary in these circumstances.[11] The judge charged the jury that they could return a verdict against Liberty only if they found that Gram was not discharged for good cause. There is no

_____

in Good Faith, 94 Harv. L. Rev. 369, 380 n.43 (1980). It eliminates the difficult burden of proving the motivations of the former employer.

The rule we adopt will not have wide implications. The amount of the renewal commissions substantially proves the outer limit of the compensation Gram lost for past service. In most other employment arrangements, the "windfall" to an employer and the loss to the former employee derived from an employee's loss of compensation for past service cannot be as clearly identified.

[11] Liberty's objections to the admission of evidence concerning a governmental agency's determination earlier that Gram was not fired for cause do not require a new trial on the question of the company's liability. The reference was apparently to a decision in Gram's favor by the Division of Employment Security. Evidence of the agency's decision was first introduced without objection. The subject was discussed with another witness before Liberty challenged the admissibility of the fact of the agency decision when the subject was brought up before a third witness. Liberty made no request to strike the evidence already admitted or for instructions concerning it. Its argument that the evidence was irrelevant seems correct, and introduction of that evidence was possibly prejudicial. The judge correctly excluded evidence of the agency decision when Liberty's counsel finally objected to its introduction. Liberty did not object to the plaintiff's counsel's apparent reference to the agency decision in his untranscribed closing argument. In short, Liberty has not adequately preserved its appellate rights on this point.

The judge did not abuse his discretion in excluding certain documents from the Commissioner of Insurance concerning Liberty's compliance or noncompliance with advertising regulations and requirements. They were peripheral to the contested issues in the case.

dispute about Gram's right to renewal commissions had he continued to work for Liberty as a salesman.

3. The judgments against Gosselin and Fisher are reversed, and judgments shall be entered in their favor. The judgment against Liberty is vacated, and the case is remanded for the determination of damages on the count against Liberty. We affirm the order denying Liberty's motion for a new trial.

*So ordered.*


NOLAN, J. (dissenting in part, concurring in part, with whom Lynch, J., joins). I dissent only from part 2 of the opinion. The court should not impose a condition on parties to a contract which neither party had ever considered. Admittedly, there was no evidence of overreaching by Liberty of the kind which makes the cases of *RLM Assocs.* v. *Carter Mfg. Corp.*, 356 Mass. 718 (1969), and *Fortune* v. *National Cash Register Co.*, 373 Mass. 96 (1977), so readily distinguishable. Gram was not fired to permit Liberty to pocket renewal commissions. Somebody must service these accounts and be compensated for such efforts. The court has restructured an at-will employment agreement to reflect an imposed condition never heretofore recognized by this court and one of doubtful legitimacy.

We are not here charged with giving relief to a party under a statute which permits compensation for a discharge without cause. We are faced with an at-will agreement freely made by competent parties and terminated by one party in a manner not inconsistent with its terms.

An employer should be free to discharge an employee without cause and without liability attaching for future compensation based on past services where such right never vested in the employee and where it is conceded that absence of good cause is not to be equated with the presence of bad faith.

The opinion calls for a trier of fact to determine "damages, measured by the amount of renewal commissions Gram

reasonably could have expected to receive, reduced to reflect the proportion of his time that would reasonably have been expected to have been devoted to the servicing of those renewal policies." The judge or jury must somehow factor into the computation of damages the possibility that the policy holder might die or cancel his policy with Liberty or that Gram might die. The court is ordering the trier of fact to engage in extravagant speculation. Pro dolor.