**Thomas HUNT, Plaintiff,**

v.

**WYLE LABORATORIES, INC., Defendant.**

**No. Civ.A. CA–96–11606–PBS.**

United States District Court, D. Massachusetts.

Feb. 24, 1997.

---

Richard C. Heidlage, Jeffrey L. Levy, Heidlage & Reece, Boston, MA, Philip S. Shaw, Rafferty, Polich & Shaw, Cambridge, MA, for Thomas Hunt, Plaintiff.

Kenneth W. Salinger, Michael R. Brown, Michael R. Brown, Palmer & Dodge, Boston, MA, for Wyle Laboratories, Inc., Defendant.

## MEMORANDUM AND ORDER ON MOTION FOR SUMMARY JUDGMENT

SARIS, District Judge.

### INTRODUCTION

This case arises out of an August 1994 decision by defendant Wyle Laboratories, Inc. ("Wyle"),[1] a manufacturer and distributor of semiconductor chips and computer products, to terminate its employment of plaintiff Thomas Hunt ("Hunt"), a design engineer hired in March of 1990. Hunt's amended complaint alleges five causes of action: breach of contract (Count I); breach of the implied covenant of good faith and fair dealing (Count II); conversion (Count III); recovery in quantum meruit (IV);[2] and copyright infringement (Count V). Wyle moves for summary judgment pursuant to Fed. R.Civ.P. 56(c) on the grounds that Hunt was lawfully terminated as an at-will employee;

---

1. It is now known as Wyle Electronics.

2. At oral argument, plaintiff waived his breach of contract and quantum meruit claims relating to work performed at Loral as well as "extra" hours and compensation for certain business expenses.

and that at no time has Wyle taken wrongful possession of any software either written or owned by Hunt. For the reasons set forth below, the Court **ALLOWS** defendant's motion for summary judgment on Counts II, III, IV and V, and the Court **DENIES** the motion on Count I only.

## BACKGROUND

Viewing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor, the Court treats the following material facts as undisputed. *See Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 36 (1st Cir. 1995), *cert. denied*, 516 U.S. 1113, 116 S.Ct. 914, 133 L.Ed.2d 845 (1996).

### A. The Job

Hunt is trained as an electrical engineer. He was hired by Wyle in the fall of 1990 as a design engineer for application-specific integrated circuit ("ASIC") chips, which are computer chips custom-designed to perform particular tasks. From the day he was hired, Hunt understood that he was an at-will employee and that his compensation package would be comprised of a base salary plus incentive bonuses.

In his capacity as a design engineer, Hunt primarily worked for Wyle in a customer support role, advising and troubleshooting for clients on a variety of chip-design issues, which ranged from conceptual difficulties to problems in implementing particular designs. Hunt's day-to-day responsibilities did not change much when he became manager of the engineering design group. Because the design engineers were experienced and self-sufficient, Hunt's managerial role did not require hands-on supervision, but rather concerned the allocation of work among them. By his own estimation, ninety percent of his work time remained on designer support projects. A small percentage of his time was spent creating designs from specifications of customers. Writing software programs was not part of Hunt's job description. He was, however, instructed to write a software pro-

gram called Xilinx for Texas Instruments in the fall of 1992, as well as to perform similar programming work for Siemens, another Wyle client, around that time.

### B. The JTAG Software

Having successfully engaged in programming work for the Texas Instruments and Siemens projects, Hunt became interested in an emerging technology standard known as joint testing action group, or "JTAG." This is a method of testing the reliability of computer chips. More accurately, it is a specification of how to provide a standard interface in a chip to get test information into or out of that chip. It can be described as the functional equivalent of a port on a chip.

In the interest of better supporting Wyle customers, as well as attracting new ones, Hunt set out on his own initiative to write the piece of JTAG software that is at issue in this action. He was at no time instructed or supervised by anyone at Wyle in this endeavor. Because Hunt's job required him to support customers with project deadlines of their own, he was not expected to keep fixed hours or a rigid work schedule. Hunt typically arrived at the office in the late morning and worked until midnight. He spent his days on client-related work and whiled away his evenings at Wyle developing the JTAG software. Hunt was given permission to use Wyle's computers in writing the software because his home computer was not a sufficient power source and because the resulting product could potentially aid in sales efforts at Wyle. Indeed, with the software up and running from early 1993, it was used on a project for Siemens in 1994, generating an additional engineering services fee. This benefited both Wyle, in the form of increased profits, and Hunt, in the form of incentive pay equal to sixty percent of that fee.

Hunt recalls that at some point after the software became viable he and Richard Timmins, then Vice President of ASIC and Technology at Wyle,[3] verbally agreed that the JTAG software would belong to Hunt. No

---

**3.** Since 1995, Timmins has occupied the title of Vice–President of Design Engineering and Market Development.

written contract was drawn up to that effect; nor did Hunt seek a copyright.

After his termination in August of 1994, Hunt requested the return of the software. Timmins instructed Jonathan Elmhurst, a Wyle engineer, to send a copy to Hunt. Within two weeks of his discharge, Hunt received a tape in the mail which he claims was blank. Upon notifying Elmhurst of the problem, Elmhurst suggested that Hunt log onto Wyle's system through a modem and download the software himself. Hunt refused this offer, for fear that if something were to go awry, he could be accused of sabotage. Instead, he asked Elmhurst to make another copy. Elmhurst, who had inherited the bulk of Hunt's workload, told Hunt that he would try to get a copy to him when his busy workload permitted.[4] After that discussion, Hunt had at least one other conversation with Elmhurst and one with Timmins seeking the return of some of his personal belongings in addition to the software; he also hand-wrote a letter to Wyle requesting the same.

In the months following Hunt's termination, Wyle conducted a complete reconfiguration of its computer system. As part of that undertaking, Elmhurst was responsible for reformatting the hard-drive—a process, he testified, that effectively deleted all files within the system, including JTAG. While Elmhurst has since searched for the software on the system, he has been unable to locate it and highly doubts whether it could have survived the system reconfiguration. There is no evidence that Wyle has ever copied, used or even accessed Hunt's software subsequent to Hunt's termination.

### C. The ViewLogic Software

While employed at Wyle, Hunt was sent a version of an expensive commercial software program called "ViewLogic" from a friend who worked for the ViewLogic company. The friend agreed to allow Wyle to use the software in his work as a means to advertise the product and ideally, to tap into Wyle's client base. In late 1993, one of Wyle's clients, Federal Products, borrowed the ViewLogic program from Hunt for approximately one month, at which time the software was returned to Hunt without incident. In the spring of 1994 Federal Products again requested use of ViewLogic, and at the urging of Timmins, Hunt reluctantly agreed. At no time did Hunt contact Federal Products— either prior or subsequent to his August 1994 discharge—to get the software back from Federal Products. Likewise, no one at Wyle ever arranged for the return of ViewLogic to Hunt, or to Wyle for that matter.

### D. The Incentive Plans

For each year that Hunt worked for Wyle, he received incentive pay on top of his base salary, calculated on a quarterly basis according to a written Design Engineer Incentive Plan ("plan"). Hunt's compensation package did not vary with the number of hours worked. Instead, the plan created a cash incentive based on the number of "design gates" a design engineer either designed or supported a customer in designing for a particular ASIC chip. A "gate" is a simply the unit used for measuring the size and complexity of a design of an ASIC chip; it is made up of a varying number of transistors. A typical ASIC chip may be comprised of several hundred to several hundred-thousand gates.

Hunt's 1992–1993 plan set a quarterly goal or incentive target of 15,000 design gates. The plan specified that earned incentives were to be paid on "signed-off" design gates; that is, those designs approved by clients and shipped to the client. In the event that an employee's participation in the plan was discontinued due to termination, incentive earnings were to be calculated on "completed design gates" as of the employee's final day on the job. Also according to the 1992–1993 plan, under no circumstances could incentive payments exceed two hundred percent of the forecast (i.e. target). Hunt's incentive pay was capped at twenty percent of his base salary in fiscal years 1993 and 1994.[5]

---

4. Elmhurst disputes that this conversation ever took place. (*See* Elmhurst Dep. at 55, 1. 10–24.)

5. In his deposition, Timmins states that at some point Wyle's payment schedule changed from a fiscal year to a calendar year; this has no bear-

While a 1994–1995 incentive plan was in effect at the time of Hunt's termination, neither party has been able to locate the original or a copy of it. As with his previous plans, under the terms of this plan, Hunt was to be paid an incentive bonus for each chip that was signed-off by a customer. Unlike previous plans, according to Hunt, once a customer signed-off on the design of a chip, he was entitled to receive incentive pay regardless of whether production chips were ever shipped to the customer. Pursuant to this arrangement, Hunt received incentive pay for ASIC designs that he helped design for Federal Products, even though the chips had not been shipped to that customer as of the date of Hunt's termination. That the chip design had been completed and approved by Federal Products triggered entitlement to an incentive bonus under Hunt's version of the plan. Prior to his termination, Hunt claims he completed additional chip designs approved by Federal Products, and at least one other Wyle customer, Synernetics, for which he received no additional incentive compensation. Hunt received $2,200 in incentive pay for the second quarter of 1994.

### E. *The Termination*

Hunt's termination in August of 1994 came as a surprise to him. There was no advance warning. He was told by Timmins that he was terminated based in large part on customer relations problems with Federal Products as well as complaints by Wyle's own employees regarding their working relationships with Hunt. Federal Products had asked Timmins to replace Hunt. Hunt's supervisors acknowledged to Hunt that Federal Products' management had been responsible for many complications and delays that had hampered their project. Yet Synernetics was also critical of Hunt. In addition, employees and customers alike had complained about Hunt's failure to prepare proper paperwork and to maintain effective information flow from the vendors. At no time was Hunt informed in writing of complaints regarding his performance on any project, or regarding his working relationships with other Wyle employees.

ing on the undisputed fact that at the time Hunt was terminated in August of 1994, "most proba-

### F. *ADD*

Hunt suffered from Attention Deficit Disorder ("ADD"), which caused him to fail to follow-up on tests of ASIC designs and to complete paperwork. He had notified Wyle of his diagnosis sometime in 1991 or 1992. From that point forward, he periodically asked his supervisors to accommodate his condition by adjusting the competing demands of his workload and reporting relationships, but to no avail. He asked for "less distractions from the salespeople." Instead, Wyle found himself coping with ever-increasing demands of a "double workload" through to the time of his termination.

## DISCUSSION

### A. *Summary Judgment Standard*

A motion for summary judgment must be allowed if:

> [T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). "It is apodictic that summary judgment should be bestowed only when no genuine issue of material fact exists and the movant has successfully demonstrated an entitlement to judgment as a matter of law." *In re Varrasso*, 37 F.3d 760, 762 (1st Cir.1994) (citing cases). A factual dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Oliver v. Digital Equipment Corp.*, 846 F.2d 103, 105 (1st Cir.1988) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "To succeed [in a motion for summary judgment], the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

bly there would have been an incentive plan" in effect. (Timmins Dep. at 70, 1, 16–17.)

"Once the moving party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.'" *Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 37 (1st Cir.1995) (quoting *Anderson*, 477 U.S. at 248). "There must be sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.'" *Rogers*, 902 F.2d at 143 (quoting *Anderson*, 477 U.S. at 249–50) (citations and footnote in *Anderson* omitted).

Finally, "summary judgment may be appropriate even in cases where elusive concepts such as motive or intent are at issue if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Woods v. Friction Materials, Inc.*, 30 F.3d 255, 259 (1st Cir.1994) (internal quotations and citations omitted).

### B. *Copyright and Conversion Claims*

Hunt alleges copyright and conversion claims regarding the JTAG software program which he had written while employed at Wyle; he also alleges a conversion claim regarding the ViewLogic commercial software program which he had loaned to a customer at Wyle's prodding.

█ First, with regard to the JTAG software, Hunt conceded at oral argument that he has offered no evidence to support his allegations that the JTAG program was copied, or otherwise unlawfully retained by Wyle after Hunt's termination. Both Timmins and Elmhurst testified that no one at Wyle was willing or able to access the software following Hunt's termination and that Wyle does not now knowingly hold a copy of the software on any of its computers. (*See* Timmins Dep. at 109, 1. 21–24 and 110, 1. 1–20; Elmhurst Dep. at 56, 1. 6–24 and 57, 1. 10–24.) Not inconsistent with that testimony, Hunt himself testified that at the time he was terminated, the software was not developed

to the point where one could access it without his instruction, i.e. by walking the user through a series of manual prompts. (*See* Hunt Dep. at 2–157, 1. 1–11.)

This conceded failure to provide even a scintilla of evidence of copying and wrongful possession is sufficient to knock out Hunt's copyright and conversion claims respectively. *See Saenger Org., Inc. v. Nationwide Ins. Licensing Associates, Inc.*, 119 F.3d 55, 59 (1st Cir.1997) ("The plaintiff in a copyright infringement case bears burden of proving (1) ownership of valid copyright, and (2) [unauthorized] copying of constituent elements of work that are original.") (citing cases); *Evergreen Marine Corp. v. Six Consignments of Frozen Scallops*, 4 F.3d 90, 96 (1st Cir.1993) ("A plaintiff asserting a conversion claim under Massachusetts law must show that: (1) the defendant intentionally and wrongfully exercised control over the personal property; (2) the plaintiff had an ownership or possessory interest in the property at the time of the alleged conversion; (3) the plaintiff was damaged by the defendant's conduct; and (4) if the defendant legitimately acquired possession of the property under a good-faith claim of right, the plaintiff's demand for its return was refused."). At worst, based on the present record, a factfinder could reasonably conclude that Wyle erased the software by mistake or did not know where to find it on the hard-drive.

█ Hunt's conversion claim regarding the ViewLogic software likewise fails, as Hunt again conceded at oral argument that he has provided no evidence that Wyle ever obtained wrongful possession of the software. This concession, coupled with Hunt's admission that he never once asked Federal Products to return the software to him, (*see* Hunt Dep. at 1–98, 1. 8–12), provides a sufficient basis for summary judgment on this claim.[6] *See Evergreen* at 95 (discussing plaintiff's required showing of defendant's wrongful control or dominion over property and refusal of demand for return of property).

In sum, because Hunt has provided no evidence to show that Wyle copied, retained,

---

6. The Court therefore need not reach Wyle's alternative argument that Hunt's common law conversion claims are preempted by federal copyright law.

or otherwise made wrongful use of either the JTAG or ViewLogic software at any time prior or subsequent to Hunt's termination, Wyle is entitled to summary judgment as a matter of law on Counts III and V.

## C. *Breach of Contract Claims*

### 1. *Wrongful Termination*

Hunt alleges that his discharge from Wyle was a breach of contract because the termination decision was taken without due notice or cause (Count I) and was motivated by discrimination based on his handicap, ADD, in violation of the covenant of good faith and fair dealing (Count II). He further claims that he is entitled to recovery in quantum meruit for the value of uncompensated services at the time of his termination (Count IV). The Court considers each of these arguments below.

As a threshold matter, there is no dispute that Hunt understood his employment contract with Wyle to be at-will, obliging neither party to provide notice or explanation to the other of a decision to terminate the employment relationship. *See Upton v. JWP Businessland*, 425 Mass. 756, 757, 682 N.E.2d 1357 (1997) ("The general rule is that an at-will employee may be terminated at any time for any reason or for no reason at all.") (citing cases). Hunt's bare allegation that he was terminated without "proper" notice and cause in Count I thus falls flat as a matter of law.

Massachusetts courts, however, have long held that the general at-will employment rule is "subject to certain limited exceptions where a covenant of good faith and fair dealing may be implied." *Masso v. United Parcel Serv. Of Am., Inc.*, 884 F.Supp. 610, 614 (D.Mass.1995) (citing cases). These limited exceptions have been construed along three separate lines of cases, yet stand together under a public policy umbrella. *See generally Cort v. Bristol–Myers Co.*, 385 Mass. 300, 304–05, 431 N.E.2d 908 (1982) (discussing reasons for discharge which have been classified as contrary to public policy and held in violation of the implied covenant of good faith and fair dealing). Each provides a cause of action for wrongful termination.

The first line of cases, represented by the pioneer decision *Fortune v. National Cash Register Co.*, 373 Mass. 96, 364 N.E.2d 1251 (1977), serves to protect the employee where the termination decision was taken in "bad faith," in order to deprive the employee of compensation for past services due or forthcoming at the time s/he was discharged. *Id.* at 104–05, 364 N.E.2d 1251; *see also Devlin v. WSI Corp.*, 833 F.Supp. 69, 77–78 (D.Mass. 1993) (noting that "[t]he holding of *Fortune* . . . requires something more than bad faith," namely, evidence that the "termination was intended to deprive [the employee] of benefits earned but not received"). *Compare Maddaloni v. Western Mass. Bus Lines, Inc.*, 386 Mass. 877, 884, 438 N.E.2d 351 (1982) (holding at-will employee entitled to recovery under Fortune upon jury finding that employer acted in bad faith in terminating employee to avoid payment of sales commissions) *with Siles v. Travenol Lab., Inc.*, 13 Mass.App.Ct. 354, 358–59, 433 N.E.2d 103 (1982) (affirming judgment notwithstanding the verdict in favor of employer where at-will employee provided no evidence under a *Fortune* theory that employer discharged employee in order to retain sales commissions or otherwise benefit financially at employee's expense), *review denied*, 386 Mass. 1103, 440 N.E.2d 1176 (1982).

The second line of cases, represented by *Gram v. Liberty Mut. Ins. Co.*, 384 Mass. 659, 429 N.E.2d 21 (1981), is a corollary of the first; it emerged to shield the employee where the termination decision was not taken in bad faith, but was without "good cause," resulting in a deprivation of "reasonably ascertainable future compensation" based upon past services. *Id.* at 671, 429 N.E.2d 21. A theory of recovery for a breach of the obligation of good faith and fair dealing under *Gram* presents a variation on the *Fortune* claim, requiring a threshold showing that the termination decision was taken without good cause (rather than in bad faith) and that it resulted in (rather than having been motivated by) the employee's deprivation of measurable compensation based upon past services. *See Biggins v. Hazen Paper Co.*, 953 F.2d 1405, 1416 (1st Cir.1992) (discussing *Gram*, holding that "[t]he Massachusetts Supreme

Judicial Court explicitly limited this theory of 'wrongful discharge' to situations in which the employee's discharge without good cause deprives the employee of compensation for services previously earned or past services"); *Coll v. PB Diagnostic Sys., Inc.,* 50 F.3d 1115, 1125 (1st Cir.1995) (same). *See generally* 45 Scott C. Moriearty et al., *Massachusetts Practice Series, Employment Law* § 3.2, at 102, n. 5–6 (2d ed.1998) (noting that the application of *Gram* requires a showing the employee's termination was without good cause resulting in an incidental financial windfall to the employer, whereas the application of *Fortune* requires a showing of bad faith intent by the employer to benefit financially from the termination).

The third line of cases provides a cause of action distinct from the *Fortune* and *Gram* lines in that it protects the employee from an employer's bad faith motivation outside of the unjust enrichment context, i.e. where the employee's termination was for reasons contrary to a "clearly established" public policy. *See Upton v. JWP Businessland,* 425 Mass. 756, 757, 682 N.E.2d 1357 (1997) ("The public policy exception makes redress available to employees who are terminated for asserting a legal right (e.g., filing a workers' compensation claim), for doing what the law requires (e.g., serving on a jury), or for refusing to disobey the law (e.g., refusing to commit perjury.") (citing *Smith–Pfeffer v. Superintendent of the Walter E. Fernald State Sch.,* 404 Mass. 145, 149–50, 533 N.E.2d 1368 (1989))).

■ With regard to Hunt's allegations of Wyle's handicap discrimination based on his ADD, Massachusetts courts have repeatedly held that M.G.L. ch. 151B is the exclusive remedy under state law for employment discrimination claims. *See Woods v. Friction Materials, Inc.,* 30 F.3d 255, 264 (1st Cir. 1994) (holding ch. 151B preempts statutory claims under ch. 93 §§ 102, 103 for race, age and handicap discrimination); *Mouradian v. General Elec. Co.,* 23 Mass.App.Ct. 538, 541, 503 N.E.2d 1318 (1987) (holding ch. 151B preempts statutory and common law claims based on age discrimination), *review denied,* 399 Mass. 1105, 507 N.E.2d 1056 (1987); *Melley v. Gillette Corp.,* 19 Mass.App.Ct. 511,

512, 475 N.E.2d 1227 (1985) (affirming motion to dismiss claim for wrongful termination on basis of age discrimination in light of remedy provided by ch. 151B, explaining that "[t]he rationale for implying a private remedy under the 'public policy exception' to the traditional rule governing at-will employment contracts is that, unless a remedy is recognized, there is no other way to vindicate such public policy.") (citing cases), *aff'd,* 397 Mass. 1004, 491 N.E.2d 252 (1986).

Hunt did file an employment discrimination claim with the Massachusetts Commission Against Discrimination on August 31, 1995, over a year after his termination; it was dismissed as untimely, thereby barring him from seeking redress under ch. 1519. Although Hunt concedes that any statutory discrimination action is thus time-barred, he claims that Wyle's decision to fire him rather than to accommodate his ADD was taken in bad faith, in violation of the covenant of good faith and fair dealing. He maintains that because the decision was based on feedback from customers and co-employees that he did not always follow up on tests of his ASIC designs and did not always complete paperwork—both primary symptoms of ADD—his termination was contrary to the clearly established public policy against discrimination. The Court holds that Hunt's attempt to circumvent the strict filing requirements of G.L. ch. 151B by casting his handicap discrimination claim as a common law claim for wrongful termination is precluded as a matter of firmly entrenched law.

■ With regard to Hunt's claim that Wyle terminated him with the bad faith intent to deprive him of compensation owed for past services, it is undisputed that a key customer, Federal Products, was so dissatisfied with Hunt's performance that it asked Wyle that he be replaced as the engineer on the project. Hunt attempts to explain away responsibility by blaming Federal Products' management deficiencies for the problems. But even taking as true that it was managerial ineptitude on the part of the client and not Hunt's own performance that resulted in hampered progress on the Federal Projects project, Hunt has provided insufficient evidence to show that Wyle's decision to termi-

nate him was intended to deprive him of compensation under *Fortune* rather than to mollify a significant customer. Even under the broader cause of action set forth in *Gram*, a business decision pursuant to a client-is-always-right philosophy does not of itself evidence unreasonableness under a good cause standard. *See Goldhor v. Hampshire College*, 25 Mass.App.Ct. 716, 723, 521 N.E.2d 1381 (1988) ("Discharge for just cause is to be contrasted with discharge on unreasonable grounds or arbitrarily, capriciously, or in bad faith.") (internal citations and quotations omitted). Indeed, Wyle's decision to terminate Hunt in order to placate important, albeit difficult, clients is a judgment well within the scope of managerial discretion. *See Goldhor*, 25 Mass.App.Ct. at 723, 521 N.E.2d 1381 (holding that an employer has just cause to terminate an employee if "there existed (1) a reasonable basis for employer dissatisfaction with a[n] ... employee, entertained in good faith ... or (2) grounds for discharge reasonably related, in the employer's honest judgment, to the needs of his business"). *See, e.g., Siles v. Travenol Laboratories, Inc.*, 13 Mass.App.Ct. 354, 359, 433 N.E.2d 103 (1982) (holding there was insufficient evidence that employer's decision to terminate at-will employee violated the implied covenant of good faith and fair dealing where employer "acted within its discretion" by discharging employee in light of "complaints concerning the employee's attitude," and "in order to preserve customer good will").

Hunt complains bitterly that he did not receive sufficient advance notice of the clients' dissatisfaction. Lack of notice, however, has not been construed as tantamount to a lack of good cause. *See Gram*, 384 Mass. at 659 n. 9, 429 N.E.2d 21 ("We attribute no particular significance to the absence of internal administrative procedures for determining the propriety of Gram's discharge."). *See generally Masso v. United Parcel Serv. of Am., Inc.*, 884 F.Supp. 610, 614 (D.Mass.1995) ("The Supreme Judicial Court ... cautions against creating a new definition of at will employment by extending the exceptions to create a rule that requires just cause to terminate an employee-at-will.").

Finally, even if Hunt had adduced sufficient evidence to create a disputed issue of fact concerning the reason for his discharge, there is insufficient evidence in the record from which this Court could conclude that termination resulted in a "windfall" to Wyle under *Fortune* or *Gram. See Gram*, 384 Mass. at 672 n. 10, 429 N.E.2d 21. As a practical matter, Gram capped the "outer limit" of damages to the amount of commissions directly related to past services. *Id.* Thus, the Gram claim is indistinguishable from the contract claim discussed in the next paragraph.

### 2. *Incentive Payments*

Analytically distinct from Hunt's breach of contract theory for wrongful termination based on the implied covenant of good faith and fair dealing, Count I of Hunt's complaint alleges a breach of contract claim based on the express 1994–1995 incentive payment plan in effect at the time of his termination. Wyle acknowledges that Hunt's compensation package, like those of all other design engineers at the company, was comprised of an annual base salary plus incentive bonuses which were calculated pursuant to a written incentive plan. While the parties agree that such a plan was in effect at the time of Hunt's termination, neither party has been able to locate a copy of that 1994–1995 plan.

Wyle contends the 1994–1995 plan, like previous annual plans issued to Hunt, entitled Hunt to receive incentive pay only for completed products that were actually shipped to a customer prior to termination of the employee's employment. Because no products were ever completed and shipped to Synernetics, the client for whom Hunt had been working at the time of his termination, Wyle argues that Hunt was not entitled to additional incentive payments with regard to that project; likewise, he was not entitled to compensation for any other designs he had been working on for Federal Products that had not been completed or shipped prior to his termination. Hunt counters that under the 1994–1995 plan, he was to be paid an incentive bonus for every chip that was

signed-off by a customer, regardless of whether the chip was ultimately shipped, and that this plan did not cap incentive pay at twenty percent of his annual base salary. He claims that he had been paid accordingly for Federal Products designs that had been completed but not shipped prior to his termination, and he asserts he had completed additional designs for Federal Products and Syernetics, for which he is entitled additional incentive pay.

Indulging all reasonable inferences in favor of Hunt, the Court must deny summary judgment on Count I. The parties do not dispute that a 1994–1995 incentive plan was in effect at the time Hunt was terminated, and that despite each party's diligent efforts, neither has been able to locate it. Given that the plan remains missing and that the parties hotly dispute its material terms and conditions, there are genuine issues of fact which preclude the Court from ruling in either party's favor as a matter of law. *See* Fed. R.Evid. 1004, 1008.

### 3. *Pendent Jurisdiction*

The record is unclear as to the amount plaintiff claims he is owed under the 1994–1995 incentive plan. If the amount is less than $50,000, the Court will decline jurisdiction pursuant to 28 U.S.C. § 1367(b).

### ORDER

Defendant's motion for summary judgment (Docket No. 28) is ***ALLOWED*** with respect to Counts II, III, IV and V, and is ***DENIED*** with respect to Count I only. Within ten (10) days of receipt of this order, plaintiff shall submit an affidavit detailing the incentive pay he claims is due him under the contract.