## William P. HENDERSON, Plaintiff-Appellee,

v.

## L.G. BALFOUR COMPANY, Defendant-Appellant.

### No. 87-2860.

United States Court of Appeals, Fifth Circuit.

Aug. 18, 1988.

---

Joseph E. O'Leary, Thomas E. Shirley, Stephen K. Fogg, Choate, Hall & Stewart, Boston, Mass., for defendant-appellant.

Blake Bailey, Jimmy Michael Negem, Tyler, Tex., for plaintiff-appellee.

Before BROWN, GEE and GARWOOD, Circuit Judges.

PER CURIAM:

L.G. Balfour Company appeals a decision by the district court denying its motion for judgment notwithstanding the verdict and, in the alternative, for a new trial. Its former employee, William P. Henderson, had sued the company seeking damages for their dispute over the terms of his employment contract. Mr. Henderson contended that he had an employment contract of indefinite length with Balfour but that the company constructively discharged him by forcing him to choose among renegotiation options that were intolerable. At trial a jury awarded Mr. Henderson $263,765.34 in damages for Balfour's breach of an implied covenant of good faith and fair dealing with respect to the terms of his employment. Upon review, however, we conclude that the record evidence entirely fails to make out such a case under Massachusetts law and that Balfour's motion for instructed verdict should therefore have been granted.

## I. *Background*

Balfour, headquartered in Massachusetts, sells, among other items, class rings and graduation-related products. Appellee Henderson, a former employee of Star Engraving Company, had sold such graduation-related items in East Texas for over seventeen years. In the spring of 1981, upon the business failure of Star, Balfour began to take over Star's assets; and Balf-

our and Mr. Henderson began negotiations with a view to having Mr. Henderson service this same part of Texas for Balfour. For Mr. Henderson, such a position would allow him to work for a firm with a wide variety of resources and to minimize his risk of obtaining commissions by drawing upon a guaranteed salary promised by Balfour. For Balfour, the employment relationship promised to strengthen its presence in the East Texas market, because Mr. Henderson would transfer his established accounts to the company in the course of time. Both sides agree that the bargaining process was competitive, with each side looking to its own interests. At issue is what the agreement finally arrived at required of each side. In order to resolve this dispute, we must first examine the basic bargain.

### A. *The Basic Bargain: The Sales Representative Agreement and Supporting Documents*

The Sales Representative Agreement defined the basic employment relationship. Both sides entered into the agreement on July 1, 1981. The very first article provides clearly that the employment relationship could be terminated "by *either* party by giving thirty (30) days notice in writing by registered mail." Thus, far from being buried in the document, the termination clause made clear at its outset that Mr. Henderson was entering into an "at-will" employment relationship.

Second, article six of the agreement provides that the "compensation of the Sales Representative shall be agreed on between the Regional Representative and the Sales Representative which shall include a salary for the Sales Representative and an allowance for his expenses." Thus, Henderson's compensation was to be the subject of periodic negotiations; if either side became dissatisfied with it, the termination clause provided an escape.

Finally, article ten provided that the Sales Representative Agreement was to be construed in accordance with the laws of Massachusetts. Moreover, except for side-agreements such as those providing for

compensation, the Sales Representative Agreement "supersede[d] all previous agreements between the parties. It constitute[d] the whole Agreement between the parties and there [were] no terms nor conditions, nor obligations made, or entered into, by Balfour other than [those] contained in the Agreement." Article ten, then, specified that the entire employment relationship was to be governed by the Sales Representative Agreement which, in turn, is best epitomized by its "at-will" provision in article one.

Based on the Sales Representative Agreement, Mr. Henderson negotiated a salary with the regional representative. From 1981 through May 1984, Balfour paid Mr. Henderson $54,307.26 each year and afforded him the possibility for earning more money by way of commission bonuses. This guaranteed salary was higher than that paid to any of the other salesmen in the regional office, a distinction attributable in part to the fact that Mr. Henderson brought accounts with him when he came to the firm.

Although the Sales Representative Agreement stated that "[i]t superseded all previous agreements between the parties [and that it] constitute[d] the whole Agreement," Mr. Henderson introduced in evidence two prior documents which he considered added to the obligations assumed by Balfour. These two documents supplemented the Sales Representative Agreement and were incorporated as part of the employment relationship through article six, which allowed for compensation to be arranged through side-agreements with the Regional Representative.

The first document was a memorandum dated April 13, 1981. It detailed various aspects of Mr. Henderson's compensation structure. Significant for this dispute is paragraph four, providing:

> Retirement will be based on 100% of the gross commission for the school years 1978–1979, 1979–1980 and 1980–1981 with the equity being equally divided over a five-year period. Retirement will begin at *his* [Henderson's] option, *no*

*earlier* than *July 1, 1984.* (emphasis added).

This document obligated Balfour to provide a retirement package that Mr. Henderson could invoke, while committing Mr. Henderson to at least a three-year tenure if he wished to receive that package.

The second document which Mr. Henderson introduced reinforced these commitments. Dated April 24, 1981, it set out in more formal terms the variety of obligations to which each side was committing itself. Most important, paragraph three of Mr. Henderson's obligations set the contract term for a period of "three years commencing July 1, 1981 to June 30, 1984."

These two documents, in addition to the Sales Representative Agreement, created the entire employment relationship from which this dispute arose. Simply stated, as Mr. Henderson agreed in cross-examination, the "fifty-four thousand dollar deal was a three-year deal, and then, [he] could retire, or it could be renegotiated, or whatever."

### B. *The Renegotiation*

Mr. Henderson worked for Balfour from 1981–1984 and converted his accounts to Balfour over this time as part of the bargain. In exchange, he received a guaranteed salary and support facilities. Beginning in February 1984, with the three-year contract period drawing to a close, Balfour and Mr. Henderson opened communications about their future relationship. By May 1984, with the end of the tenure term only a month away, Henderson had not responded to Balfour's efforts to confect a new working relationship. It is important to bear in mind that the termination option was available to either party at this time for use in severing the relationship. Since Mr. Henderson had not completed three years of service, such a termination would have operated under the April 13, 1981, memorandum to deny him retirement benefits; and if Balfour was seeking to be rid of Henderson, this was the time to strike, since Henderson had converted most of his accounts to the company.

Instead, in a letter dated May 29, 1984, Balfour made three proposals to Mr. Henderson regarding their future business relationship. The first offered him immediate retirement July 1, 1984 under the terms of the retirement program specified in the April 13, 1981, document. The second offered continued employment at a guaranteed yearly salary of $41,400, representing about a $13,000 salary cut. In another respect, however, the proposal bettered his former wage package: he was to receive 50% of every gross commission dollar generated in excess of his 1983 figures, a commission twice that paid to other salesmen. Essentially, Balfour proposed to shift some of the risk of generating new sales to Henderson. Under this proposal, Mr. Henderson's retirement benefits under his previous three-year contract were also guaranteed. Finally, the third proposal offered a reduced salary plus an accelerated retirement program. Henderson would receive a $20,000 base salary for six months (July 1, 1984 through January 1, 1985) plus approximately $50,000 in retirement benefits to be paid in installments between September 1, 1984 and January 1, 1986.

Mr. Henderson, after less than a month's consideration of these options, chose proposal three as the next step in his employment relationship with Balfour—and brought this action. He acknowledged at trial that he had received all the money that he was due under the option that he selected.

It now appears that Mr. Henderson may have made various assumptions about his ability to renegotiate a life-time bargain with Balfour: he acknowledges that no specific representations were made to him, but claims that it was the "atmosphere" of meetings that guided him in his renegotiation expectations. We are, however, limited in our capacity to grasp and give effect to "atmosphere"; hence we must rely on the written structure of the 1981 employment contract and the reasonable expectations that could arise from it.

### II. *Analysis*

Despite the at-will feature of the employment contract, the jury awarded Mr.

Henderson $263,765.34 in damages, concluding that Balfour breached an implied covenant of good faith and fair dealing in its negotiations with Mr. Henderson over contract renewal. In examining contract jurisprudence so as to evaluate the verdict, we focus on Massachusetts law, which both parties agreed would govern the employment relationship.

### Good Faith and Fair Dealing

Mr. Henderson maintains that the term of employment he agreed upon with Balfour in 1981 was open-ended and that he believed he would have a life-time job at the same wages. He contends that Balfour violated this aspect of the employment contract by making renegotiation offers that required him either to take an unacceptable pay cut or to elect retirement. In his view, proposal two, that which allowed continued employment, was really a non-option since it so radically altered the current terms of his employment that he was precluded from remaining on the job. In creating this non-option, we are told, Balfour negotiated in bad faith.

■ Although the termination provision of the Sales Representative Agreement gave Balfour the right to end the employment relationship "at will," Massachusetts jurisprudence imposes an obligation upon Balfour to deal in good-faith. *See Fortune v. National Cash Register Co.*, 373 Mass. 96, 364 N.E.2d 1251, 1255–56 (1977). Massachusetts courts have held employers liable for breach of the implied covenant of good faith and fair dealing, however, "only when they have *terminated* an employee." *McCone v. New England Telephone and Telegraph Co.*, 393 Mass. 231, 471 N.E.2d 47, 50 n. 7 (1984) (emphasis added). It is Henderson's claim that he was constructively terminated by Balfour.[1] Second, "the obligation of good faith and fair dealing ... requires that the employer be liable for the loss of compensation that is so clearly related to an employee's past service, when the employee is discharged without good cause." *Gram v. Liberty Mutual Insurance Co. (Gram II)*, 384 Mass. 659, 429 N.E.2d 21, 29 (1981) (citations omitted). "Our [Massachusetts' courts] decisions have recognized a distinction between the loss of future wages for past service and the loss of future income for future services." *Id.* Henderson claims that Balfour's future income from the accounts that he converted to it under the employment relationship would be attributable solely to his past services since it would take little effort to maintain the accounts. In this respect, he characterizes ring sales arising from his former accounts as mere "renewals."

■ Henderson's presentation does not meet these criteria. First, we cannot conclude that the renewal proposals were conditions so intolerable as to compel Mr. Henderson to resign. To the contrary, his choice of option three enabled him to work for six more months and then to accept a retirement plan that was in line with any reasonable expectations derivable from his 1981 contract.[2]

As we note above, Henderson rejected proposal one, which embodied the reasonable expectations arising from the 1981 written agreements. Those provided for a three-year, fifty-four thousand dollar per year deal which, if completed, made him eligible for a retirement plan based on his commissions from 1978–81. This is the most that Mr. Henderson had a right to expect; and this is what proposal one set out. And although Mr. Henderson claims today that the "atmosphere" of the meet-

---

1. Although Massachusetts courts have assumed that such terminations may be either actual or constructive, *see McCone, supra*, 471 N.E.2d at 49–51, they have said little about what constitutes constructive termination in at-will contexts. A typical formula, based on Texas law, runs: "An employer's activities may be deemed to amount to a constructive discharge only if 'the employer made conditions so intolerable that the employee *reasonably* felt compelled to resign.'" *Kelleher v. Flawn*, 761 F.2d 1079, 1086 (5th Cir.1985).

2. To adopt Henderson's view, we would have to accept the notion that for an employer to propose changing the terms of an employee's compensation so as to lower his guarantee but raise his contingent compensation is intolerable, a curious proposition indeed.

ings indicated an automatic renewal of the employment agreement, we are aware of no law that proceeds on any such basis. Nor did proposal two produce intolerable conditions. If anything, the cut in pay to $41,400 was more than offset by the larger percentage offered on future commissions, and the package actually provided Mr. Henderson the opportunity to earn more money. Thus, based on what reasonable expectations might be inferred from the 1981 agreements, and examining Balfour's proposal for contract renewal, it is impossible to conclude that Mr. Henderson was constructively terminated.

Nor does Mr. Henderson show that Balfour is liable for a loss of future compensation that is clearly related to his past service in establishing the accounts. As we note above, Massachusetts courts distinguish between the loss of future wages for past services, which is covered under an implied covenant of good faith, and the loss of future income for future services, which is not. Mr. Henderson tries to claim that his past services in initiating the ring accounts would automatically lead to future income for Balfour, since little work would be needed to maintain the accounts. Thus, he contends that his situation is covered by the implied covenant of good faith and fair dealing.

Massachusetts courts have, however, held that "the generalized expectation of future orders in types, quantities and sums not known at the time of termination [in this case Mr. Henderson]," *Gerald Rosen Co. v. International Telephone and Telegraph Co.*, 16 Mass.App. 929, 450 N.E. 2d 189, 190 (1983) (future orders by insurance salesmen not covered under *Fortune* concept of bad faith), do not constitute the kind of "future income for past services" that triggers judicial protection under the implied covenant of good faith and fair dealing. Although Balfour has Mr. Henderson's former accounts, given a competitive market it is not clear that it can keep them. Hence, future income is not merely a function of Mr. Henderson's past services. For this reason, Mr. Henderson's contention and the jury's decision that the implied covenant of good faith and fair dealing was breached are incorrect as a matter of (Massachusetts) law.

### Conclusion

The district court erred in denying Balfour's motion for a judgment notwithstanding the verdict. The evidence indicates only that, in negotiating Mr. Henderson's contract, Balfour made business decisions that were permitted it by the employment relationship that it had bargained for in 1981. Further, as a matter of Massachusetts law, Balfour breached no implied covenant of good faith and fair dealing in its renegotiation. First, the options offered Mr. Henderson were tolerable and in keeping with any conceivable reasonable expectations arising from his employment relationship with Balfour. Second, if second be required, it cannot be said that Balfour will be earning future income from ring orders that are solely the result of Mr. Henderson's past services. Therefore, because on this record it cannot be concluded that Balfour constructively discharged Mr. Henderson and denied him the direct fruits of his past services, considerations of good faith and fair dealing in the at-will employment contract are not triggered under Massachusetts law.

We therefore REVERSE the judgment of the district court and RENDER judgment for Balfour.