Mark **EVANS**, Plaintiff,

v.

**CERTIFIED ENGINEERING & TESTING CO., INC., R. Wayne Crandlemere, Glenn Sylvester, Bridge Atlantic Corp. and Francois Carrette, Defendants.**

Civ. A. No. 91–12660–H.

United States District Court,
D. Massachusetts.

Jan. 28, 1993.

William F. Swiggart, Cambridge, MA, for plaintiff.

John A. Wortmann, Jeffrey J. Upton, Brown, Rudnick, Freed, & Gesmer, Boston, MA, for defendants.

## ORDER

BOWLER, United States Magistrate Judge.

Pursuant to 28 U.S.C. § 636(c), this breach of contract action was referred to this court for trial. On November 3, 1992, defendants Certified Engineering & Testing Company, Inc. ("CETCO"), Wayne Crandlemere ("Crandlemere"), Glenn Sylvester ("Sylvester") and Bridge Atlantic Corporation ("BAC") (collectively: "defendants") filed a motion for summary judgment seeking summary judgment on all counts contained in plaintiff Mark Evans' amended complaint (Docket Entry # 23). (Docket Entry # 28). Defendants also move for summary judgment in their favor on Count I of CETCO's counterclaim (Docket Entry # 18). (Docket Entry # 28).

Plaintiff Mark Evans ("plaintiff"), a former CETCO employee, objects to summary judgment. (Docket Entry ## 38 & 42). On November 30, 1992, this court heard argument and took defendants' motion for summary judgment (Docket Entry # 28) under advisement.

### BACKGROUND

Plaintiff began working at CETCO, an environmental services corporation, in 1985 as an industrial hygienist. Although admittedly an employee at will, he claims that CETCO breached an oral contract to provide him one month's severance pay and buy back his shares in CETCO at a price of $4.00 per share. Plaintiff further alleges that defendants breached a Shareholders Agreement

("Shareholders Agreement") dated June 1, 1990. Plaintiff left CETCO's employ on or about March 8, 1991. The parties dispute whether plaintiff was constructively discharged prior to this date.

Plaintiff brings the following counts in his amended complaint:

(1) Count I against CETCO for breach of an oral contract for one month's severance pay made with Leonard Seale ("Seale"), a former president of CETCO, in December 1991;

(2) Count II against CETCO for the constructive termination of plaintiff without cause under the Shareholders Agreement, thereby entitling plaintiff to a mandatory buy back of his shares of CETCO stock at a price of $4.00 per share;

(3) against CETCO, Crandlemere, Sylvester and BAC for breach of an implied covenant of good faith and fair dealing with respect to plaintiff's employment at CETCO (Count III);[1]

(4) Count IV against Crandlemere, Sylvester and BAC for intentionally interfering with plaintiff's contractual relationship with CETCO;[2]

(5) Count V against Crandlemere, Sylvester and BAC for intentional interference with plaintiff's advantageous business relationship with CETCO;[3]

(6) Count VII against Crandlemere and Sylvester for deceit;[4]

(7) Count VIII against CETCO for violation of section 11 of Massachusetts General Laws chapter 93A ("chapter 93A") in connection with CETCO's attempts to deprive plaintiff of his equity interest in CETCO;

(8) Count IX against Crandlemere, Sylvester and BAC for breaching their fiduciary duty owed to plaintiff, a minority shareholder in CETCO, a closely held corporation; and

(9) Count XI against CETCO for promissory estoppel inasmuch as plaintiff detrimentally relied on Seale's oral promise of one month's severance pay.

Facts are summarized as follows. In October 1987, plaintiff moved to Utica, New York to open and manage a separate corporation, Certified Engineering and Testing Company of Upstate New York, Inc. ("UTICA"). (Docket Entry # 35, Ex.B, pp. 11 & 15).[5] UTICA was apparently a joint venture with CETCO. According to Seale, UTICA was "principally a one client office" with the majority of revenues obtained from plaintiff's association with Jack Eisenbach Engineering in Utica, New York. (Docket Entry # 35, Ex. A, pp. 23 & 36–37; *accord,* Docket Entry # 35, Ex. B, p. 25).

In order to obtain needed financing, UTICA was later merged into CETCO in or around December 1989. UTICA thereby became a branch office of CETCO with plaintiff entering into CETCO's employ as Branch Manager of the UTICA office.

A letter dated January 11, 1990, dictates the terms of plaintiff's employment relationship with CETCO. As of this date, plaintiff became an employee at will. (Docket Entry # 35, Ex. A, pp. 48–55; Docket Entry # 2, Ex. C). His compensation in 1990 was based, in part, on a formula derived from gross revenues received from the UTICA office. (*Id.*).

In June 1990, CETCO received an infusion of capital from BAC. CETCO, BAC and various corporate shareholders, including plaintiff, executed the Shareholders Agreement on or about June 1, 1990. The Shareholders Agreement includes a clause requiring mandatory repurchase of an employee's stock in the event the employee is terminated without cause. The mandatory buy back price, originally set at $400.00 per share, was

---

1. Count X also asserts a breach of an implied covenant of good faith and fair dealing claim against CETCO based on plaintiff's employment contract with CETCO.

2. The parties stipulated to the dismissal of this count as to defendant Francois Carrette. (Docket Entry # 36).

3. The parties stipulated to the dismissal of this count as to defendant Francois Carrette. (Docket Entry # 36).

4. The parties stipulated to the dismissal of Count VI for conspiracy. (Docket Entry # 36).

5. Page ten of this deposition is missing from the record.

reduced to $4.00 per share because of a stock split. (Docket Entry # 35, Ex. A, pp. 28–31 and Ex. B, pp. 17–21; Docket Entry # 2, Ex. D).

At the time plaintiff signed this agreement, he relied, in part, on Seale's positive opinion of the document. Although he does not recall viewing the buy back provision when he signed the signature page, he states that he would have assumed that the document contained such a provision. It was not until February 8, 1991, that plaintiff actually saw the first 24 pages of the Shareholders Agreement. Page 24 contains the pertinent mandatory buy back provision. (Docket Entry # 31, Ex. A, pp. 44–54; Docket Entry # 2, Ex. C).

CETCO's performance declined in 1990 resulting in a Salary Reduction Plan instituted in the fall of 1990 and the termination of a number of employees. (Docket Entry # 35, Ex. A, pp. 50–51 and Ex. B., pp. 31–37). More importantly, on or about December 27, 1990, plaintiff, Seale and Sylvester had a business meeting. The subject matter of their discussion is disputed. (Docket Entry # 35, Ex. A, pp. 38–39 & 44 and Ex. B, pp. 56–57; Docket Entry # 31, pp. 76–81).

Seale and plaintiff maintain they discussed the prospect of closing the UTICA office and the effect of the closure on plaintiff's employment relationship with CETCO. Seale states that he told plaintiff that, in the event CETCO closed the UTICA office and could not find an alternate, acceptable position for plaintiff in the company, "We would provide him with one month's severance pay and buy back his shares of stock in accordance with the terms of the Shareholders Agreement." (Docket Entry # 35, Ex. A, pp. 38–39). Plaintiff essentially concurs that Seale made this representation. (Docket Entry # 31, Ex. A, p. 79). Sylvester, however, does not recall discussing the prospect of terminating plaintiff in the event of closing the UTICA office. (Docket Entry # 35, p. 57).

The parties further dispute whether, at this December 1990 meeting, Seale agreed to provide plaintiff a one month's grace period before deciding to close the UTICA office and also set specific sales goals that plaintiff would need to meet to avoid such closure.

(Docket Entry # 35, Ex. A, pp. 44–46 and Ex. B, p. 57; Docket Entry # 31, pp. 78–79). Seale maintains he discussed an agreement with plaintiff to increase sales bookings and set certain sales targets for the UTICA office. (Docket Entry # 35, Ex. A, pp. 37 & 44–45).

Plaintiff states that Seale gave him another month in which to bring in sales to the UTICA office. (Docket Entry # 31, Ex. A, pp. 78–80). Upon returning to the UTICA office after the meeting, plaintiff states he continued to encourage the UTICA staff to bring in additional work. There was a general understanding among office personnel that their continued existence depended upon bringing in additional work. Plaintiff also tried to appeal to Jack Eisenbach on a personal level in order to receive additional work. (Docket Entry # 31, pp. 80–83). Sylvester disputes these contentions and states he does not recall that Seale told plaintiff that the UTICA office would be closed unless plaintiff met specific sales targets. (Docket Entry # 35, Ex. B, p. 57).

On or about January 22, 1991, Seale states that he met with plaintiff and Sylvester and informed plaintiff that the UTICA office was being closed. (Docket Entry # 35, Ex. A, pp. 44–45). Plaintiff remembers that Seale called him into his office and told him, shortly before the January 22, 1991, shareholders' meeting, that he had decided to close the UTICA office. (Docket Entry # 31, Ex. A, pp. 84–85). Sylvester, however, does not recall discussing plaintiff's termination between the period of December 27, 1990, and January 25, 1991. (Docket Entry # 35, Ex. B, p. 61). According to plaintiff, the minutes of the January 22, 1991, shareholders' meeting fail to reflect an announcement regarding closing the UTICA office. (*Id.*, pp. 94–95).

On or about January 24, 1991, Crandlemere, Sylvester, Kevin McCarthy, Marie Stoeckel and plaintiff had dinner in New York City prior to a January 25, 1991, shareholders' meeting. At dinner, Crandlemere told plaintiff that Seale was no longer the Chief Executive Officer ("CEO") of CETCO. Seale was terminated as CEO by shareholder vote at the January 25, 1991, meeting in New

York City. (Docket Entry # 35, Ex. A, pp. 106–107 & 110–112).

During January and February of 1991, CETCO negotiated with BAC to obtain additional capital and amended the Shareholders Agreement. The amendment reduced the price of buy back CETCO stock from $4.00 per share to .79 cents per share. (Docket Entry # 31, Ex. C, pp. 105–106 & 142). The circumstances of this negotiation remain unclear. The date of the amendment is February 12, 1991. (Docket Entry # 31, Ex. C, p. 142; Docket Entry # 2, Ex. E).

According to plaintiff, he informally discussed his future at CETCO with Sylvester after the January 25, 1991, meeting during a taxicab ride to the airport. Also according to plaintiff, he had a telephone conference call on February 6, 1991, between himself, Crandlemere and Sylvester about alternative employment positions at CETCO in lieu of his position as Branch Manager of the UTICA office.. After a second telephone conversation, they agreed to meet in person on February 8, 1991. (Docket Entry # 31, Ex. A, pp. 117–125).

On February 8, 1991, plaintiff met with various individuals, including Crandlemere and Sylvester, at the CETCO office in Weymouth, Massachusetts. (Docket Entry # 35, Ex. B, pp. 62–63; Docket Entry # 31, Ex. A, pp. 128–136 & Ex. C, p. 139). Sylvester provided plaintiff with copies of the pertinent pages of the Shareholders Agreement containing the mandatory buy back provision. (Docket Entry # 35, Ex. B, pp. 71–74; Docket Entry # 31, Ex. A, p. 46). Crandlemere states that plaintiff accepted, without qualification, a position as Project Manager in the Weymouth office. (Docket Entry # 31, Ex. C, pp. 121 & 125–128). Plaintiff's proposed duties as Project Manager at the Weymouth office remain unclear. (Docket Entry # 31, Ex. A, p. 136 and Ex. C, pp. 112–117).

Plaintiff disputes his acceptance of the Weymouth position. He maintains that he informed Sylvester and others that he wanted to speak with his wife before deciding whether to accept the Weymouth position. He states that he was offered only "limited opportunities" at CETCO on February 8, 1991. It was during this time that, according to plaintiff, he first learned of the devaluation of the buy back price of CETCO stock effectuated, without his input, by the February 1991 amendment to the Shareholders Agreement. (Docket Entry # 31, Ex. A, pp. 128–136; Docket Entry # 35, Ex. B, p. 79).

Plaintiff returned to Utica after the meeting. On or about February 22, 1991, plaintiff received, apparently by mistake, a facsimile transmission distributed to CETCO branch managers stating that plaintiff had accepted a transfer to the "Boston Branch" and would remain with CETCO. By letter dated February 23, 1991, plaintiff advised Crandlemere that he had no choice but to accept the position of Project Manager. He informed Crandlemere that CETCO had made no offer of employment commensurate with his position as Branch Manager of the UTICA office. He was therefore forced to resign as Project Manager and request repurchase of his CETCO stock in accordance with the terms of the Shareholders Agreement. (Docket Entry ## 1, Ex. B & Docket Entry # 23, p. 9).

On or about March 8, 1991, plaintiff left CETCO's employ. Shortly thereafter, he accepted a position with Jack Eisenbach Engineering where he worked for approximately 11 months until March 1992. (Docket Entry # 31, Ex. B, pp. 5 & 20–25). In the fall of 1990 and the winter of 1991, CETCO's efforts to retain the business of Jack Eisenbach Engineering were largely unsuccessful.[6] (Docket Entry # 31, Ex. C, pp. 109–110). According to Crandlemere, CETCO continued its efforts to secure business in the Utica area after plaintiff left its employ. (Docket Entry # 31, Ex. C, p. 111). He believed that closing the UTICA office was not imminent in early 1991 and that it would remain open. (Docket Entry # 31, Ex. C, pp. 74 & 93). He nevertheless also described the office as "having severe problems" and as dying "a

---

6. With respect to the UTICA office, the February 19, 1991, facsimile states: "[W]e have ceased operations [at the UITCA office] as a full branch ... We will continue our attempts to sell services in the Utica area and may have the opportunity to reopen the branch if enough work can be procured." (Docket Entry # 1, Ex. A).

slow death." (Docket Entry #31, Ex. C, pp. 85 & 116).

Jonathan Bass, the sole CETCO employee at the UTICA office after plaintiff left, avers that CETCO did not support the UTICA office. Consequently, he resigned as a CETCO employee in June 1991 and the office was closed three weeks thereafter. (Docket Entry #41).

When plaintiff left CETCO in March 1991, he was subject to a Confidentiality, Invention Assignment and Non–Competition Agreement ("Non–Competition Agreement"). (Docket Entry #2, Ex. B & C). The Non–Competition Agreement provides that during the one year period following "voluntary termination," the former employee "shall not undertake employment with any [c]ompetitor" of CETCO. The agreement further prohibits solicitation of business from CETCO customers. (*Id.*).

While at Jack Eisenbach Engineering, plaintiff states he performed a site analysis for Norstar Bank. While previously at CETCO, plaintiff had performed work for the same company. To the extent of his knowledge, Jonathan Bass avers that, "No customers of the UTICA branch of CETCO took their business to Jack Eisenbach Engineering after [plaintiff] had left CETCO." (Docket Entry #41, ¶23). Munson Williams Proctor Institute, a former CETCO client, also approached Jack Eisenbach Engineering at a time, according to plaintiff, when CETCO no longer had an office in Utica. (Docket Entry #31, Ex. B, pp. 20–21).

## DISCUSSION

Defendants move for summary judgment on all counts contained in plaintiff's amended complaint (Docket Entry #23). (Docket Entry #28). Summary judgment is permissible when "there is no genuine issue as to any material fact and … the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).[7] Inferences are drawn in favor of plaintiff, the nonmoving party. *Space Master International, Inc. v. City of*

*Worcester,* 940 F.2d 16 (1st Cir.1991); *Herbert W. Price v. General Motors Corporation,* 931 F.2d 162 (1st Cir.1991) (record viewed in light most favorable to nonmoving party).

In deciding whether a factual dispute is genuine, this court must determine whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *accord Aponte–Santiago v. Lopez–Rivera,* 957 F.2d 40, 41 (1st Cir. 1992) (citing *Anderson,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A fact is "material" if it might affect the outcome of the suit under the governing substantive law. *Beck v. Somerset Technologies,* 882 F.2d 993 (5th Cir.1989) (citing *Anderson,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

Although defendants need not produce evidence negating plaintiff's claims that there is a material issue in genuine dispute, *Kirby v. Cullinet Software, Inc.,* 721 F.Supp. 1444, 1448 (D.Mass.1989), they must affirmatively show that there is an absence of evidence to support plaintiff, the nonmoving party's, case. *Celotex Corporation v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). "It is not enough to move for summary judgment without supporting the motion in any way or with a conclusory assertion that the plaintiff has no evidence to prove his case." *Id.* at 328, 106 S.Ct. at 2555 (White, J., concurring).

Defendants must therefore inform this court of the basis for their motion, i.e., the absence of an oral contract and the absence of a constructive discharge, and identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, "which demonstrate the absence of a genuine issue of material fact." *Winter Hill Frozen Foods & Services, Inc. v. Haagen–Dazs Co.,* 691 F.Supp. 539 (D.Mass.1988) (citing *Celotex,* 477 U.S. at 319, 106 S.Ct. at 2550).

---

7. Rule 56(c), Fed.R.Civ.P., sets forth the following standard for entry of summary judgment: if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Finally, once the moving party carries its burden under Rule 56(c), plaintiff, as the nonmoving party, must do "more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

### 1. *Count I*

Tracking the amended complaint (Docket Entry # 23), defendants first move for summary judgment as to Count I. Count I, as noted above, is brought against CETCO for breach of the alleged oral promise made by Seale on or about December 27, 1990. Defendants argue that the oral promise is unenforceable because of the absence of consideration and because the agreement violates the statute of frauds applicable to transactions in securities. Mass.Gen.L. ch. 106, § 8–319.

 Gratuitous oral promises are not enforceable. Rather, there must be a "legal benefit to the promisor," CETCO, as well as some "detriment to the promisee," plaintiff. *Congregation Kadimah Toras–Moshe v. DeLeo*, 405 Mass. 365, 540 N.E.2d 691, 692 (1989). In the analogous area of private pension disputes, an employee's continued employment in reliance on an employer's oral promise to pay a pension may constitute sufficient consideration to enforce the oral promise. *See Balkin v. Katz*, 373 Mass. 419, 367 N.E.2d 628, 629–630 (1977) (employee's continued employment for six year period after oral pension promise provides sufficient evidence of consideration to allow case to go to jury). Plaintiff's continued employment at CETCO, however, should be in reliance on the oral promise. *See Wood v. Roy Lapidus, Inc.*, 10 Mass.App.Ct. 761, 413 N.E.2d 345, 349 (1980) (citing *Balkin* ).

 It is undisputed that plaintiff was an employee at will. As such, he was not contractually bound to continue working in the UTICA office in December 1990. He nevertheless did so after the December 1990 conversation with Seale and engaged in personal efforts to secure additional business from Eisenbach in an effort to meet the alleged sales targets. *See Biggins v. Hazen Paper Company*, 953 F.2d 1405, 1418 (1st Cir.), *cert.*

*den.,* —— U.S. ——, 112 S.Ct. 2990, 120 L.Ed.2d 868 (1992) (discussing whether continued service as employee after stock promise constitutes adequate consideration and finding sufficient evidence to support jury's finding under Massachusetts law); *cf. Jackson v. Action for Boston Community Development, Inc.*, 403 Mass. 8, 525 N.E.2d 411, 415 (1988) (*dicta* noting that, in appropriate circumstances, remaining with employer after receipt of employment manual may supply consideration to incorporate terms of manual into employment contract). CETCO also received the benefit of plaintiff's added efforts to secure work in the UTICA office.

This court therefore finds sufficient evidence of consideration to survive summary judgment in light of plaintiff's continued employment at CETCO, his additional efforts to obtain work from Eisenbach and the benefit enuring to CETCO from plaintiff's efforts. *See, e.g., Monaco v. Lombard Brothers, Inc.*, 24 Mass.App.Ct. 941, 509 N.E.2d 28, 29 (1987) (genuine issue of material fact existed as to whether plaintiff/employee, who canceled other work engagements in order to work for defendant/employer, provided sufficient consideration to enforce oral promise).

 Defendants next claim that plaintiff's breach of the oral contract violates the statute of frauds applicable to contracts for the sale of securities. Mass.Gen.L. ch. 106, § 8–319. An employee stock option comes within the meaning of section 8–319. *See Hall v. Horizon House Microwave, Inc.*, 24 Mass.App.Ct. 84, 506 N.E.2d 178, 182–183 (1987) (employee stock option subject to § 8–319). Section 8–319 states that a contract for the sale of securities is not enforceable "unless: (a) there is some writing signed by the party against whom enforcement is sought ... to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price." Mass. Gen.L. ch. 106, § 8–319(a); *see Colt v. Fradkin*, 361 Mass. 447, 281 N.E.2d 213, 217 (1972) (letters executed and sent after series of telephone calls satisfied § 8–319(a)).

 In response to defendants' argument that the statute of frauds bars enforcement of the oral contract, plaintiff contends

that the "severance agreement" was not an agreement to purchase securities but rather an agreement to terminate plaintiff under certain circumstances. (Docket Entry # 38). In light of *Hall*, this court disagrees. Nor does the Shareholders Agreement executed six months before the alleged oral contract sufficiently constitute "some writing ... to indicate a contract has been made" under section 8–319(a) for purposes of enforcing the oral contract.

Nevertheless, plaintiff generally maintains that he acted in reliance on Seale's oral promise. Massachusetts law recognizes that actions taken in reliance upon a material misrepresentation may estop a party from raising a statute of frauds defense. *Frederick v. ConAgra*, 713 F.Supp. 41, 45 (D.Mass. 1989) (general Massachusetts statute of frauds, Mass.Gen.L. ch. 259, § 1, does not, as a matter of law, bar enforcement of oral employment contract inasmuch as employee reasonably relied to his detriment); *Hoffman v. Optima Systems, Inc.*, 683 F.Supp. 865, 869 (D.Mass.1988) (same). Nor, absent contrary authority forthcoming from defendants within 30 days of the date of this Order, is the estoppel doctrine inapplicable to the statute of frauds contained in section 8–319 of the Uniform Commercial Code.[8] Whether plaintiff's conduct satisfies the elements of estoppel, *see Frederick v. ConAgra*, 713 F.Supp. at 45 (noting elements of estoppel in context of oral employment promise), constitutes a genuine issue of material fact.

Count I, based on the alleged breach of Seale's oral promise to pay plaintiff one month's severance upon termination and buy back his shares in accordance with the terms of the Shareholders Agreement, therefore survives defendants' motion for summary judgment.

### 2. *Count II*

Defendants also seek summary judgment as to Count II. Count II is for breach of contract against CETCO under the terms of the Shareholders Agreement for failing to honor the $4.00 buy back price of plaintiff's

CETCO stock. (Docket Entry # 23). Defendants argue that plaintiff was not constructively discharged inasmuch as the conditions imposed under the Weymouth position were not so difficult or unpleasant such that a reasonable person would be forced to resign. (Docket Entry # 34). In addition, defendants contend that even if plaintiff was constructively discharged his discharge took place after the effective date of the amendment to the Shareholders Agreement (February 12, 1991). As noted previously, this amendment reduced the buy back price of employee stock from $4.00 per share to .79 cents per share. (Docket Entry # 34).

The Shareholders Agreement provides for mandatory repurchase, at the option of the terminated employee, "in the event employment is terminated without cause." (Docket Entry # 2, Ex. D). The meaning of these words and whether plaintiff was constructively terminated "without cause" before February 12, 1991, are genuine issues of material fact.

"A material change in an employee's duties or a significant reduction in rank may constitute a breach of contract entitling the employee to damages." *Steranko v. Inforex, Inc.*, 5 Mass.App.Ct. 253, 362 N.E.2d 222, 230 (1977); *see, e.g., Miller v. Winshall*, 9 Mass. App.Ct. 312, 400 N.E.2d 1306, 1310 (1980) (executive employee under written agreement offered subsidiary position was thereupon involuntarily terminated within meaning of stock option contract entitling employee to higher buy back price of company stock). Massachusetts courts have assumed that a termination may be actual or constructive, even in an "at will" context. *McCone v. New England Telephone and Telegraph Company*, 393 Mass. 231, 471 N.E.2d 47, 49–50 (1984); *see also Henderson v. L.G. Balfour*, 852 F.2d 818 (5th Cir.1988), *cert. den.*, 492 U.S. 906, 109 S.Ct. 3216, 106 L.Ed.2d 566 (1989) (citing *McCone* for this proposition).

The events surrounding plaintiff's termination are disputed. On February 8, 1991, plaintiff spoke with several individuals at

---

8. Absence of such authority or a motion to renew defendants' summary judgment motion with respect to the statute of frauds issue within 30 days of the date of this Order shall constitute a waiver of this argument.

CETCO's Weymouth office. He was offered an alternative position as Project Manager at the Weymouth office. As Branch Manager in the UTICA office, project managers reported to plaintiff. Also, in describing his duties as Branch Manager in the UTICA office versus his prospective duties as Project Manager in the Weymouth office, plaintiff noted distinct dissimilarities and additional responsibilities associated with the position of Branch Manager. (Docket Entry #31, Ex. A, pp. 141–142). The duties associated with Project Manager at the Weymouth office are not entirely clear. (Docket Entry #31, Ex. C, pp. 112–115). When asked if the two positions involved the same level of responsibility, Crandlemere was somewhat equivocal. (Docket Entry #31, Ex. C, pp. 117–118). Consequently, given these conflicting descriptions, whether plaintiff was constructively terminated constitutes a genuine issue of material fact.

The date of the alleged constructive termination without cause is also subject to dispute. According to plaintiff, he was only offered "limited opportunities" on February 8, 1991. (Docket Entry #31, Ex. A, p. 129). Defendants point out that plaintiff continually negotiated with CETCO up until his February 23, 1991, letter of resignation and failed to communicate his dissatisfaction with the Weymouth position to CETCO prior to this time. By letter dated February 23, 1991, plaintiff advised Crandlemere he was accepting the position and simultaneously resigning from the Project Manager position because CETCO had forced his resignation.

The weight of the evidence tilts in defendants' favor. It is, however, not the function of this court to weigh the evidence. Rather, construing the evidence in plaintiff's favor, this court must determine whether a genuine issue of material fact exists concerning the date of the alleged constructive termination "without cause." In the event a constructive termination took place on February 8, 1991, such action might constitute a substantial breach of the employment agreement such as to excuse plaintiff from further performance. See Neddar v. Knapp Shoes, Inc., 32 Mass. App.Ct. 462, 590 N.E.2d 713, 716 (1992) (right to damages arose at time of company's substantial breach, entitling employee to stock price in effect at the time of the breach). Given the disputed nature of the testimony concerning job duties and what actually occurred at the Weymouth office on February 8, 1991, defendants' summary judgment motion is denied as to Count II.

### 3. *Counts III and X*

Defendants seek summary judgment on plaintiff's claims for breach of an implied covenant of good faith and fair dealing (Counts III and X). Count III alleges that CETCO, Crandlemere, Sylvester and BAC breached an implied covenant of good faith and fair dealing contained in the Shareholders Agreement. The amended complaint (Docket Entry #23) states that, by failing to inform plaintiff of negotiations to amend the Shareholders Agreement and reduce the buy back price of employee stock from $4.00 per share to .79 cents per share, CETCO, Crandlemere, Sylvester and BAC breached an implied covenant of good faith and fair dealing included in the Shareholders Agreement. In Count X, plaintiff makes a similar claim, i.e., that CETCO breached an implied covenant of good faith and fair dealing with respect to plaintiff's employment contract by erroneously advising plaintiff on February 8, 1991, that the buy back price of employee stock was .79 cents per share. (Docket Entry ## 23 & 38).

■ It is well settled that "at will" employee contracts in Massachusetts include an implied covenant of good faith and fair dealing in certain circumstances. *Kravetz v. Merchants Distributors, Inc.*, 387 Mass. 457, 440 N.E.2d 1278, 1280 (1982); *Gram v. Liberty Mutual Insurance Company*, 384 Mass. 659, 429 N.E.2d 21, 25–26 (1981) (citing *Fortune v. National Cash Register Company*, 373 Mass. 96, 364 N.E.2d 1251 (1977)). Such a covenant requires that neither party "do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Tanol Distributors, Inc. v. Panasonic Company, Division of Matsushita Electric Corporation of America*, 1987 WL 13319 at * 6 (D.Mass. July 2, 1987).

Defendants first argue that Count III fails because plaintiff was never terminated, constructively or otherwise, by CETCO. (Docket Entry # 34). For reasons stated with respect to Count II, there exists a factual dispute concerning whether plaintiff was constructively terminated "without cause." Defendants next argue that plaintiff was fully informed of the negotiations which resulted in the lowered price of buy back stock. Defendants' contention, however, belies the record and, in particular, plaintiff's deposition testimony to the contrary. (Docket Entry # 31, Ex. A, pp. 123–127 & 130–133). Summary judgment is therefore improper based on these arguments with respect to Counts III and X.

#### 4. *Count VII*

 Defendants seek summary judgment as to Count VII against Crandlemere and Sylvester for deceit on the basis that this claim is repetitive of Count III and plaintiff fails to demonstrate facts to support Count III. (Docket Entry # 34, p. 21). The facts supporting Count III are, however, disputed. Although similar facts may support either claim, the elements for the tort of deceit, *see Treadwell v. John Hancock Mutual Life Insurance Company*, 666 F.Supp. 278, 284 (D.Mass.1987) (stating elements) are also distinct from the elements detailed above for breach of an implied duty of good faith and fair dealing. Consequently, defendants' argument is unavailing and Count VII survives their motion for summary judgment.

#### 5. *Counts IV and V*

Defendants move for summary judgment on Count IV against Crandlemere, Sylvester and BAC for intentionally interfering with plaintiff's contractual relationship with CETCO. A claim for intentional interference with contractual relations requires proof that: "(1) the plaintiff had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by [defendants'] actions." *Wright v. Shriners Hospital*, 412 Mass. 469, 589 N.E.2d

1241, 1245–1246 (1992) (citing *United Truck Leasing Corporation v. Geltman*, 406 Mass. 811, 551 N.E.2d 20 (1990)).

 It is settled law that an employer may not be held liable for tortiously interfering with its own contract. *Gram v. Liberty Mutual Insurance Company*, 429 N.E.2d at 24 & n. 3. Defendants point out that Crandlemere, Sylvester and BAC signed the Shareholders Agreement and consequently cannot be held liable for their alleged interference with this agreement. In light of *Gram*, this court concurs. Count IV is, however, also based on plaintiff's oral contract with CETCO, including the alleged oral agreement to buy back plaintiff's shares in accordance with the terms of the Shareholders Agreement (Docket Entry # 23). As such, Count IV survives summary judgment to the extent based on the alleged oral contract.

Defendants also move for summary judgment with respect to Count V. Count V, brought against Crandlemere, Sylvester and BAC for intentional interference with plaintiff's advantageous business relationship with CETCO, requires proof of the following elements: "(1) a business relationship or contemplated contract of economic benefit; (2) the defendant's knowledge of such relationship; (3) the defendant's intentional interference with it; and (4) the plaintiff's loss of advantage directly resulting from the defendant's conduct." *Nelson v. Energy Exchange Corporation*, 727 F.Supp. 59, 63 (D.Mass.1989) (citing *Comey v. Hill*, 387 Mass. 11, 438 N.E.2d 811 (1982)).

 Individual defendants, such as in the case at bar, "may escape liability if the interference was privileged as part of [their] employment responsibilities." *Treadwell v. John Hancock Mutual Life Insurance Company*, 666 F.Supp. at 289–290 & n. 4 (action by employee against employer based upon forced retirement). Stated otherwise, there must be a showing that the individual defendants "acted with actual malice, in the sense of malevolence, spite or ill will." *Charles River Data Systems, Inc. v. Oracle Complex Systems Corporation*, 788 F.Supp. 54, 60 (D.Mass.1991); *accord, Wright v. Shriners Hospital*, 589 N.E.2d at 1246 (defendant had right to fire plaintiff/employee unless he act-

ed "malevolently, i.e., for a spiteful, malignant purpose, unrelated to the legitimate corporate purpose"). Thus, Crandlemere and Sylvester possess a certain freedom to act in the corporate setting without fear of personal liability.

■ It is entirely possible and indeed probable, based on the record before this court, that the actions of Crandlemere and Sylvester were related to a legitimate corporate purpose. CETCO was experiencing severe financial difficulties in early 1991. Nevertheless, it is also true that concealing the negotiations and the effective date of the amendment to the Shareholders Agreement would result in a financial benefit to Crandlemere and Sylvester, i.e., their CETCO stock or equity ownership would be greater if CETCO paid plaintiff the lower buy back price. According to plaintiff, during lunch with Crandlemere and Sylvester on February 8, 1991, Crandlemere told plaintiff that: " 'We will not terminate you. Therefore, you can't sell your stock.' And that the value of the stock was now 79 cents a share, and that according to some Securities and Exchange Commission's ruling that even if they wanted to buy back my stock they couldn't." (Docket Entry # 31, Ex. A, p. 131).[9]

As noted in *Gram v. Liberty Mutual Insurance Company*, 384 Mass. 659, 429 N.E.2d 21, 24 (1981), the line between a proper inference of malice and unwarranted conjecture based on possibilities "is not easily drawn." Similarly, "where motive, intent, or other state of mind questions are at issue, summary judgment is often inappropriate." *Flesner v. Technical Communications*, 410 Mass. 805, 575 N.E.2d 1107, 1110 (1991) (plaintiff/employee alleging constructive discharge in violation of public policy). Although the issue is close, this court finds genuine issues of material fact exist as to whether Crandlemere's and Sylvester's actions were improper in motive or means or motivated by actual malice.

Plaintiff's briefs (Docket Entry ## 38 & 42) and his amended complaint (Docket Entry # 23), however, fail to identify any facts applicable under Counts IV and V to BAC to support his claims for intentional interference with contractual relations and intentional interference with advantageous business relations.[10] Nor do defendants address BAC's role or lack thereof with respect to Counts IV and V. *See* LR. 56.1. The parties are therefore **ORDERED** to confer and advise this court within 30 days of the date of this Order concerning whether they can stipulate to the dismissal of Counts IV and V as to BAC. Defendants' motion for summary judgment as to Crandlemere and Sylvester under Counts IV and V is inappropriate in light of the factual issues described above.

### 6. *Count VIII*

■ Defendants next move for summary judgment as to Count VIII against CETCO for violation of chapter 93A in connection with CETCO's attempts to deprive plaintiff of his equity interest in CETCO. In *Manning v. Zuckerman*, 388 Mass. 8, 444 N.E.2d 1262, 1266 (1983), the Massachusetts Supreme Judicial Court held that "[d]isputes arising out of the employment relationship between an employer and an employee are not cognizable under c. 93A." Courts in this district have applied *Manning* to bar similar claims based on chapter 93A. *See, e.g., Hoffman v. Optima Systems, Inc.*, 683 F.Supp. at 871 (dispute by former employee who was "joint venturer entitled to eighteen percent (18%) of the equity of Optima" arose in employment context and therefore chapter 93A claim dismissed); *William Putnam and Kathryn Broman v. Adams Communication Corporation*, 1987 WL 13262 at * 5 (D.Mass. June 15, 1987) (dismissing chapter 93A claims in breach of promise and wrongful termination of employment suit). Plaintiff's attempt to characterize this claim as indepen-

---

**9.** Nor does this statement constitute inadmissible hearsay inasmuch as this statement would be offered to prove Crandlemere's state of mind or motive under Rule 803(3), F.R.E.

**10.** In fact, plaintiff's memoranda (Docket Entry ## 38 & 42) maintain that the sole claim against BAC is under Count IX for breach of fiduciary

duty. The amended complaint (Docket Entry # 23), however, states that Counts IV and V are brought against BAC. Although the joint stipulation (Docket Entry # 36) dismisses these counts as to defendant Francois Carrett, no mention is made as to BAC.

dent of plaintiff's employment relationship with CETCO is unavailing. Defendants' motion for summary judgment as to Count VIII is **ALLOWED**.

### 7. *Count IX*

Defendants additionally move for summary judgment as to Count IX. Under Count IX, plaintiff seeks damages against Crandlemere, Sylvester and BAC for breach of their fiduciary duty as shareholders in CETCO, a closely held corporation.

Stockholders in a close corporation generally owe each other a fiduciary duty of " 'utmost good faith and loyalty.' " *Leader v. Hycor, Inc.*, 395 Mass. 215, 479 N.E.2d 173, 177 (1985) (citing and limiting holding in *Donahue v. Rodd Electrotype Co. of New England*, 367 Mass. 578, 328 N.E.2d 505, 515 (1975)). As noted in *Leader*, however, the Massachusetts Supreme Judicial Court tempered application of the strict good faith standard enunciated in *Donahue* in a later decision, *Wilkes v. Springside Nursing Home, Inc.*, 370 Mass. 842, 353 N.E.2d 657 (1976). *Leader v. Hycor, Inc.*, 479 N.E.2d at 177 (citing *Wilkes* and recognizing that "untempered application" of *Donahue* standard would result in limiting legitimate corporate action and unduly hampering corporate management); *see generally Wartski v. Bedford*, 926 F.2d 11, 13–14 (1st Cir.1991) (discussing fiduciary duty under Massachusetts law); *Shane v. Shane* 891 F.2d 976, 986 (1st Cir. 1989) (former shareholder in close corporation alleging improper buy out by defendant shareholder); *Cecconi v. Cecco, Inc.*, 739 F.Supp. 41, 45 (D.Mass.1990) (discussing breach of fiduciary duty under Massachusetts law). Breach of this fiduciary duty may entitle an innocent party to damages, including the difference between the value of what was received in the transaction and its purchase price. *See generally*, 37 J. Nolan and L. Sartorio, *Massachusetts Practice, Tort Law*, § 146 (1989); *Danca v. Taunton Sav-*

*ings Bank*, 385 Mass. 1, 429 N.E.2d 1129, 1133 (1982).

Under this theory, plaintiff claims he is entitled to the higher buy back price of $4.00 per share inasmuch as Crandlemere and Sylvester inaccurately advised plaintiff that the buy back price of his shares was .79 cents.[11] The record supports this claim to the extent there are genuine issues of material fact concerning the existence of the oral agreement as discussed above and the extent of the fiduciary duty owed by Crandlemere and Sylvester to advise plaintiff of the negotiations and the resulting impact on his shares. (Docket Entry # 31, Ex. A, pp. 123–124 & 128–133). Under Massachusetts law, shareholders in a close corporation ordinarily "may not act out of avarice, expediency or *self-interest* in derogation of their duty of loyalty to the other stockholders and to the corporation." *Wartski v. Bedford*, 926 F.2d at 13 (emphasis added). Count IX therefore survives defendants' motion for summary judgment.

### 8. *Count XI*

Turning to Count XI against CETCO for promissory estoppel, defendants move for summary judgment on the basis that no oral promise was made[12] and that plaintiff took no action in reliance on such a promise. (Docket Entry # 34, p. 27). Massachusetts cases recognize the theory of promissory estoppel. *Loranger Construction Corporation v. E.F. Hauserman Company*, 376 Mass. 757, 384 N.E.2d 176, 179 & n. 1 (1978) (collecting cases); *see Nelson v. Energy Exchange Corporation*, 727 F.Supp. at 62–63 (citing *Loranger* and denying summary judgment on promissory estoppel theory). Although at one point in his deposition plaintiff did not recall doing anything differently after Seale allegedly made the oral promise in December 1991 (Docket Entry # 31, Ex. A, p. 84), at another point plaintiff

---

11. According to the representations of the parties and the record, plaintiff apparently owned an estimated 2% of CETCO shares worth, at the higher buy back price of $4.00 per share, approximately $90,000.00. (Docket Entry # 34, p. 25; Docket Entry # 38, p. 5; Docket Entry # 31, Ex. A, p. 126).

12. The existence and content of the oral promise, as previously discussed, is a genuine issue of material fact.

states he tried to appeal to Jack Eisenbach on a personal level in order to receive additional work. (Docket Entry # 31, p. 83). This court therefore remains unpersuaded by defendants' arguments and, accordingly, Count XI survives their motion for summary judgment.

### 9. *Count I of CETCO's Counterclaim*

As a final matter, defendants move for summary judgment on Count I of CETCO's counterclaim for plaintiff's alleged breach of the Non–Competition Agreement. Defendants essentially allege that plaintiff accepted a position with Jack Eisenbach Engineering after he left CETCO's employ and solicited customers of CETCO on behalf of Jack Eisenbach Engineering. Defendants further maintain that plaintiff violated the Non–Competition Agreement by failing to return all documents generated by plaintiff during the course of his employment at CETCO. (Docket Entry ## 18 & 34).

Bearing in mind that defendants have the burden of proof on their motion for summary judgment, it is nevertheless evident that plaintiff worked for Jack Eisenbach Engineering up until March 1992. (Docket Entry # 31, Ex. B, pp. 5 & 20–25). Eisenbach was a major client for CETCO in the UTICA office. According to Crandlemere, "We still had hope to get work from Eisenbach in the summer of '91 ... and basically with Mark going over to Eisenbach, it brought Eisenbach the capability of doing work that we did for him." (Docket Entry # 31, Ex. C, p. 155).

Plaintiff argues that the Non–Competition Agreement is unenforceable because CETCO had no legitimate business interests in the Utica area. *See Shipley Company, Inc. v. Clark*, 728 F.Supp. 818, 826–827 (D.Mass.1990) (covenants not to compete are enforced in Massachusetts to the extent such covenants "reasonably protect the legitimate business interests of the employer"). Covenants not to compete are generally enforceable only to the extent necessary to protect an employer's legitimate business interests. Ordinary competition, however, is not a legitimate business interest. *Marine Contractors Company, Inc. v. Hur-*

*ley*, 365 Mass. 280, 310 N.E.2d 915, 920 (1974). CETCO undeniably has a legitimate interest in protecting its good will with its former clients. The determination is, however, one of assessing the reasonable needs of CETCO for protection balanced against the reasonableness of the restraint imposed on plaintiff. *All Stainless, Inc. v. Colby*, 364 Mass. 773, 308 N.E.2d 481, 485 (1974).

Although the issue is extremely close, this court cannot, as a matter of law, find that plaintiff breached the Non–Competition Agreement. Summary judgment is therefore DENIED on Count I of CETCO's counterclaim.

### CONCLUSION

For reasons stated above, defendants' motion for summary judgment (Docket Entry # 28) is **ALLOWED** as to Count VIII and otherwise **DENIED**. The parties shall advise this court within 30 days of the date of this Order as to the prospect of entering into a stipulation dismissing Counts IV and V as to BAC.